IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


STACEY McDAVID,
     Petitioner,

vs.                       Case No.:  4:16cv30/WS/EMT

FLORIDA DEPARTMENT OF CORRECTIONS,
     Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (ECF No. 1). Respondent filed an answer and relevant portions of the state court record (ECF No. 7). Petitioner filed a reply (ECF No. 15).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b). After careful consideration of all issues raised by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases. It is further the

opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 7).[1] Petitioner was charged in the Circuit Court in and for Leon County, Florida, Case No. 2004-CF-4416, with one count of solicitation to commit sexual battery on a child less than twelve (12) years of age (Count 1) and seventy-eight (78) counts of possession of child pornography (Counts 2–79) (Ex. A at 18–26). A jury trial was held on May 18–19, 2006 (Exs. C, D, E). The court granted the defense's motion for judgment of acquittal as to Count 7 (Ex. E at 250–52). The jury found Petitioner guilty as charged on all of the remaining counts (Ex. A at 90–117, Ex. E at 311). On September 25, 2006, the court sentenced Petitioner to thirty (30) years in prison on Count 1, a consecutive term of five (5) years in prison on Count 2, and concurrent terms of five (5) years in prison on Counts 3–6 and 8–79, to run concurrently with the sentence on Count 2, all with pre-sentence jail credit of 650 days (Ex. A at 125–34, Ex. F).

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (ECF No. 7). If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

Case No.: 4:16cv30/WS/EMT

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D06-5464 (Exs. H, I). The First DCA affirmed the judgment per curiam without written opinion on April 18, 2008, with the mandate issuing May 6, 2008 (Ex. J). <u>McDavid v. State</u>, 980 So. 2d 494 (Fla. 1st DCA 2008) (Table).

On May 1, 2009, Petitioner filed a motion for post-conviction relief in the state circuit court, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. K). Petitioner subsequently filed an amended motion and a second amended motion (Ex. L at 1–56). The circuit court appointed counsel to represent Petitioner and scheduled an evidentiary hearing (*id.* at 175, 182). Prior to the hearing, Petitioner filed a motion to discharge counsel and represent himself, which the court granted (*id.* at 187–91). The evidentiary hearing was held on November 8, 2013, at the conclusion of which the court announced its decision denying Petitioner's second amended Rule 3.850 motion and set forth its reasons for doing so (Ex. O). The circuit court rendered a written decision on November 13, 2013 (Ex. M at 379). Petitioner appealed the decision to the First DCA, Case No. 1D13-6118 (Ex. V). The First DCA affirmed the decision per curiam without written opinion on August 27, 2015, with the mandate

issuing November 6, 2015 (Exs. Y, AA). <u>McDavid v. State</u>, 177 So. 3d 254 (Fla. 1st DCA 2015) (Table).

On the same day Petitioner filed his initial Rule 3.850 motion, he filed a "Petition for Belated Appeal" in the First DCA, Case No. 1D09-2132, alleging ineffective assistance of appellate counsel (Ex. BB). The First DCA denied the petition on the merits on May 21, 2009 (Ex. CC). <u>McDavid v. State</u>, 11 So. 3d 993 (Fla. 1st DCA 2009) (Mem). The court denied Petitioner's motion for rehearing on July 6, 2009 (Ex. DD).

Petitioner filed the instant federal habeas action on January 14, 2016 (ECF No. 1).

## II.    STANDARD OF REVIEW

Federal courts may grant habeas corpus relief for persons in state custody pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Pub. L. 104-132, § 104, 110 Stat. 1214, 1218–19. Section 2254(d) provides, in relevant part:

> **(d)**  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (2011).

The United States Supreme Court explained the framework for § 2254 review in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). The appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Id., 529 U.S. at 412–13 (O'Connor, J., concurring).

Employing the Williams framework, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a state court proceeding, the federal court must first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." Lockyer v. Andrade, 538 U.S. 63,

71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" only when a Supreme Court holding at the time of the state court decision embodies the legal principle at issue. Thaler v. Haynes, 559 U.S. 43, 47, 130 S. Ct. 1171, 175 L. Ed. 2d 1003 (2010); Woods v. Donald, — U.S. —, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015) ("We have explained that clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions." (internal quotation marks and citation omitted)).

After identifying the governing legal principle(s), the federal court determines whether the state court adjudication is contrary to the clearly established Supreme Court case law. The adjudication is not contrary to Supreme Court precedent merely because it fails to cite to that precedent. Rather, the adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases. Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."). Where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law. See Woods, 135 S. Ct. at 1377 (holding, as to claim that

counsel was per se ineffective in being absent from the courtroom for ten minutes during testimony concerning other defendants: "Because none of our cases confront the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks and citation omitted)). If the state court decision is contrary to clearly established federal law, the federal habeas court must independently consider the merits of the petitioner's claim. *See* <u>Panetti v. Quarterman</u>, 551 U.S. 930, 954, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007).

If the "contrary to" clause is not satisfied, the federal habeas court next determines whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The federal court defers to the state court's reasoning unless the state court's application of the legal principle(s) was "objectively unreasonable" in light of the record before the state court. <u>Williams</u>, 529 U.S. at 409; *see* <u>Holland v. Jackson</u>, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam). In applying this standard, the Supreme Court has emphasized:

> When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong. Federal habeas review thus exists as "a guard against extreme

> malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." _Harrington_, _supra_, at 102–103, 131 S. Ct. 770 (internal quotation marks omitted).

Woods, 135 S. Ct. at 1376 (quoting Harrington v. Richter, 562 U.S. 86, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. _See_ Gill v. Mecusker, 633 F.3d 1272, 1292 (11th Cir. 2011). As with the "unreasonable application" clause, the federal court applies an objective test. Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). Federal courts "may not characterize . . . state-court factual determinations as unreasonable merely because we would have reached a different

conclusion in the first instance." Brumfield v. Cain, — U.S. —, 135 S. Ct. 2269, 2277, 192 L. Ed. 2d 356 (2015) (quotation marks omitted).

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct. 28 U.S.C. § 2254(e)(1). The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*; *see, e.g.*, Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by the AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"). Neither the Supreme Court nor the Eleventh Circuit has interpreted how § 2254(d)(2) and § 2254(e)(1) interact in the context of fact-based challenges to state court adjudications. *See* Cave v. Sec'y for Dep't of Corr., 638 F.3d 739 (11th Cir. 2011). However, the Eleventh Circuit has declined to grant habeas relief under § 2254(d)(2) in the context of a state appellate court's summary affirmance, where it found that the validity of the state court decision was not premised on the trial court's unreasonable fact finding, and that the petitioner failed to demonstrate "by clear and convincing evidence that the record reflect[ed] an insufficient factual basis for affirming the state court's decision." Gill, 633 F.3d at 1292.

Only if the federal habeas court finds that the petitioner satisfied the AEDPA and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See* Panetti, 551 U.S. at 954. Even then, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a). "If this standard is difficult to meet, that is because it was meant to be." Richter, 562 U.S. at 102.

## III.    EXHAUSTION AND PROCEDURAL DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C. § 2254(b)(1),[2] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." Duncan v. Henry, 513 U.S. 364,

---

[2] Section 2254 provides, in pertinent part:

(b)(1)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
        (A)   the applicant has exhausted the remedies available in the courts of the State; or
                (B) (i)  there is an absence of available State corrective process; or
                   (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c)  An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

365, 115 S. Ct. 887, 130 L. Ed. 2d 865 (1995) (quoting <u>Picard v. Connor</u>, 404 U.S.

270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).  To satisfy the

exhaustion requirement, the petitioner must "fairly present" his claim in each

appropriate state court, alerting that court to the federal nature of the claim.  <u>Duncan</u>,

513 U.S. at 365–66; <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845, 119 S. Ct. 1728, 144

L. Ed. 2d 1 (1999); <u>Picard</u>, 404 U.S. at 277–78.

The Supreme Court has offered the following guidance for determining whether

a habeas petitioner has met the "fair presentation" requirement.  In <u>Picard v. Connor</u>,

the Court held that, for purposes of exhausting state remedies, a claim for relief in

habeas corpus must include reference to a specific federal constitutional guarantee, as

well as a statement of the facts which entitle the petitioner to relief.  404 U.S. at 277.

In announcing that "the substance of a federal habeas corpus claim must first be

presented to the state courts," *id.*, 404 U.S. at 278, the Court rejected the contention

that the petitioner satisfied the exhaustion requirement by presenting the state courts

only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is insufficient to make a general

appeal to a constitutional guarantee as broad as due process to present the "substance"

of such a claim to a state court.  In <u>Anderson v. Harless</u>, 459 U.S. 4, 103 S. Ct. 276,

74 L. Ed. 2d 3 (1982), the habeas petitioner was granted relief on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt. *Id.* 459 U.S. at 7 (citing <u>Sandstrom v. Montana</u>, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)). The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law." <u>Anderson</u>, 459 U.S. at 7. The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the <u>cited</u> case advanced a federal claim. *Id.*, 459 U.S. at 7 & n.3. Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought. *Id.*

Years later the Supreme Court readdressed the "fair presentation" requirement in <u>Duncan v. Henry</u>, 513 U.S. 364. The <u>Duncan</u> Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue

in terms of the applicable federal right in state court in order to obtain federal review of the issue.[3]  The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court."  <u>Duncan</u>, 513 U.S. at 365–66.

In <u>Baldwin v. Reese</u>, the Supreme Court again focused upon the requirement of "fair presentation," holding that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so."  541 U.S. 27, 32, 124 S. Ct. 1347, 158 L. Ed. 2d 64 (2004).  The <u>Baldwin</u> Court commented that "a litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'"  *Id.*, 541 U.S. at 32.  With regard

---

[3] The petitioner in <u>Duncan</u> raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal.  Presented with a state constitutional claim, the state court applied state law in resolving the appeal.

to this statement, the Eleventh Circuit stated in <u>McNair v. Campbell</u>, 416 F.3d 1291

(11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor
> indeed for petitioners seeking to establish exhaustion. However, we
> agree with the district court that this language must be "applied with
> common sense and in light of the purpose underlying the exhaustion
> requirement[:] 'to afford the state courts a meaningful opportunity to
> consider allegations of legal error without interference from the federal
> judiciary.'" <u>McNair</u> [<u>v. Campbell</u>], 315 F. Supp. 2d [1277,] 1184 [(M.D.
> Ala. 2004)] (quoting <u>Vasquez v. Hillery</u>, 474 U.S. 254, 257, 106 S. Ct.
> 617, 620, 88 L. Ed. 2d 598 (1986)). This is consistent with settled law
> established by the Supreme Court. . . . We therefore hold that "'[t]he
> exhaustion doctrine requires a habeas applicant to do more than scatter
> some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302–03 (citations omitted).[4]

An issue that was not properly presented to the state court and which can no

longer be litigated under state procedural rules is considered procedurally defaulted,

i.e., procedurally barred from federal review. <u>Bailey v. Nagle</u>, 172 F.3d 1299,

1302–03 (11th Cir. 1999). This court will also consider a claim procedurally

---

[4] In his initial brief before the Court of Criminal Appeals, the petitioner cited one federal case
in a string citation containing other state cases, and in a closing paragraph in his argument that
extraneous materials were considered by the jury during deliberations, stated that there was a
violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the
United States Constitution, the Alabama Constitution[,] and Alabama law." <u>McNair v. Campbell</u>,
416 F.3d 1291, 1303 (11th Cir. 2005). The court found that these references to federal law were not
sufficient to meet the fair presentment requirement and noted that it was important that the petitioner
had never mentioned the federal standards regarding extraneous materials in his brief, but relied on
state law for his arguments. *Id.*

defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default. *See* <u>Coleman v. Thompson</u>, 501 U.S. 722, 734–35 & n.1, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991); <u>Caniff v. Moore</u>, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); <u>Chambers v. Thompson</u>, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord* <u>Tower v. Phillips</u>, 7 F.3d 206, 210 (11th Cir. 1993); <u>Parker v. Dugger</u>, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991). In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine. <u>Bailey</u>, 172 F.3d at 1303. In the second instance, a federal court must determine whether the last state court rendering judgment clearly and expressly stated its judgment rested on a procedural bar. *Id*. A federal court is not required to honor a state's procedural default ruling unless that ruling rests on adequate state grounds independent of the federal question. *See* <u>Harris v. Reed</u>, 489 U.S. 255, 109 S. Ct. 1038, 103 L. Ed. 2d 308 (1989). The adequacy of

a state procedural bar to the assertion of a federal question is itself a federal question.

Lee v. Kemna, 534 U.S. 362, 122 S. Ct. 877, 151 L. Ed. 2d 820 (2002).

The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision. Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001). First, the last state court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim.[5] Id. Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law. Id. Third, the state procedural rule must be adequate. Id. The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion. Id.

To overcome a procedural default, the petitioner must show cause and prejudice or a fundamental miscarriage of justice in order for the federal habeas court to reach the merits of a claim. Tower, 7 F.3d at 210; Parker, 876 F.2d 1470. "For cause to exist, an external impediment, whether it be governmental interference or the

---

[5] The federal court should honor the procedural bar even if the state court alternatively reviewed the claim on the merits. Marek v. Singletary, 62 F.3d 1295, 1302 (11th Cir. 1995); Alderman v. Zant, 22 F.3d 1541, 1549 (11th Cir. 1994).

Case No.: 4:16cv30/WS/EMT

reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." <u>McCleskey v. Zant</u>, 499 U.S. 467, 497, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991) (quoting <u>Murray v. Carrier</u>, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986)). To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." <u>Schlup v. Delo</u>, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." <u>Schlup</u>, 513 U.S. at 327. Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.

*Id.* Although a habeas petitioner asserting a convincing claim of actual innocence need not prove diligence to overcome a procedural bar, timing is a factor relevant in evaluating the reliability of a petitioner's proof of innocence. *See* <u>McQuiggin v. Perkins</u>, — U.S. —, 133 S. Ct. 1924, 1935, 185 L. Ed. 2d 1019 (2013). As the Court stated in <u>Schlup</u>, "[a] court may consider how the timing of the submission and the likely credibility of [a petitioner's] affiants bear on the probable reliability of . . .

evidence [of actual innocence]."  513 U.S. at 332; *see also* <u>House v. Bell</u>, 547 U.S. 518, 537, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006).

Within this framework, the court will review Petitioner's claims.

## IV.    PETITIONER'S CLAIMS[6]

A.    <u>Ground One</u>:  "The State of Florida did not appoint counsel to professionally develop and present Petitioner's 1st tier collateral review under Rule 3.850; such depriving [sic] Petitioner his rights under the U.S. Constitutions [sic] 5th, 6th, and 14th Amendment; federal law [sic]; and holdings of the U.S. Supreme Court."

<u>Ground Seven</u>:  "The trial court did not give Petitioner a full and fair evidentiary hearing on a Rule 3.850 postconviction motion; said [sic] depriving Petitioner his rights under the U.S. Constitutions [sic] 5th, 6th, and 14th Amendments; federal law [sic]; and holdings of the U.S. Supreme Court."

In Ground One, Petitioner contends the state circuit court violated his constitutional rights by failing to appoint counsel to represent him in the Rule 3.850 proceeding (ECF No. 1 at 6).  Petitioner argues the failure to appoint counsel resulted in one of his post-conviction claims being denied as procedurally barred, and several other issues to be "missed or not developed, presented, or argued effectively" (*id.*). Petitioner asserts he presented this claim to the state circuit court at the evidentiary hearing on his Rule 3.850 motion, and in Ground One of his initial brief in the post-conviction appeal of the circuit court's denial of his Rule 3.850 motion (*id.* at 6–8).

---

[6] The undersigned consolidated some of Petitioner's claims for organizational purposes.

In Ground Seven, Petitioner contends the state circuit court obstructed his ability to be heard, develop his claims, present evidence, testify, examine witnesses, make closing arguments, "and more," during the evidentiary hearing in the Rule 3.850 proceeding (ECF No. 1 at 20). Petitioner asserts he presented this claim to the First DCA on appeal of the circuit court's decision denying the Rule 3.850 motion (*id.* at 20–22).

Respondent contends Ground One is not cognizable in federal habeas, because a defendant has no constitutional right to counsel in post-conviction proceedings (ECF No. 7 at 4–6). Respondent further contends Ground One is procedurally barred because Petitioner failed to fairly present this claim in his post-conviction appeal (*id.* at 6–7). With respect to Ground Seven, Respondent argues the claim is conclusory, because Petitioner does not identify what rulings of the state circuit court allegedly obstructed Petitioner's ability to develop and present his post-conviction claims (*id.* at 20). Respondent additionally contends the First DCA's rejection of this claim in the post-conviction appeal was reasonable (*id.*).

"The Supreme Court has long held that there is no constitutional right to counsel in post-conviction proceedings, . . . which necessarily means that a habeas petitioner cannot assert a viable, freestanding claim for the denial of the effective

assistance of counsel in such proceedings." <u>Chavez v. Sec'y, Fla. Dep't of Corr.</u>, 742 F.3d 940, 944–45 (11th Cir. 2014) (citing <u>Coleman v. Thompson</u>, 501 U.S. 722, 752, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991)).  The Supreme Court's decision in <u>Martinez v. Ryan</u>, 566 U.S. 1, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012) did not alter that Supreme Court precedent; instead, "it reiterated [it], expressly acknowledging that a habeas petitioner is precluded from relying on the ineffectiveness of his postconviction attorney as a ground for relief."  <u>Chavez</u>, 742 F.3d at 945 (citing <u>Martinez</u>, 501 U.S. at 16).  Therefore, Ground One, a freestanding claim alleging the state court failed to provide Petitioner effective assistance of post-conviction counsel in the Rule 3.850 proceeding, fails to state a claim upon which federal habeas relief may be granted.  *See, e.g.*, <u>Thomas v. Crews</u>, No. 4:12cv84/LAC/CAS, 2014 WL 6633552, at *6 (N.D. Fla. Nov. 24, 2014) (unpublished but recognized as persuasive authority); <u>Brooks v. Crews</u>, No. 4:11cv346/MW/CAS, 2014 WL 4280775 at *19 (N.D. Fla. Aug. 29, 2014) (unpublished); <u>Williams v. Crews</u>, No. 5:11cv356/MMP/EMT, 2013 WL 1729004, at *5 (N.D. Fla. Feb. 25, 2013) (unpublished).

Petitioner's Ground Seven also fails to state a claim upon which federal habeas relief may be granted.  Federal habeas relief is available to remedy defects in a

defendant's conviction and sentence, but "an alleged defect in a collateral proceeding does not state a basis for habeas relief." Quince v. Crosby, 360 F.3d 1259, 1262 (11th Cir. 2004); *see also* Alston v. Dep't of Corrs., Fla., 610 F.3d 1318, 1325 (11th Cir. 2010); Carroll v. Sec'y, DOC, 574 F.3d 1354, 1365 (11th Cir. 2009) (collecting cases). There is a valid reason behind this principle: "[A] challenge to a state collateral proceeding does not undermine the legality of the detention or imprisonment—*i.e.*, the conviction itself—and thus habeas relief is not an appropriate remedy." Carroll, 574 F.3d at 1365. Furthermore, such challenges often involve issues of state law, and "[a] state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved." McCullough v. Singletary, 967 F.2d 530, 535 (11th Cir. 1992). Therefore, Petitioner's challenge to the procedures employed by the state court in the Rule 3.850 proceeding does not provide a basis for federal habeas relief.

> B.  Ground Two: "The Petitioner was denied his right to effective assistance of counsel under the 6th Amendment to the U.S. Constitution when counsel failed to move to suppress Petitioner's coerced involuntary statements to police during custodial interrogation and the evidence gained thereby; such depriving Petitioner his rights under the U.S. Constitutions [sic] 5th, 6th, and 14th Amendments; federal law [sic]; and holdings of the U.S. Supreme Court."

Petitioner claims that his trial counsel was ineffective for failing to seek suppression of his post-arrest statements to law enforcement (ECF No. 1 at 8).

Petitioner contends that through his statements, law enforcement "obtained Petitioner's confession of the location of critical evidence," specifically, his computer (*id.* at 8–9). Petitioner asserts he presented this claim as Ground Two in his initial brief on direct appeal of his conviction, and as Issues One and Two of his Rule 3.850 motion (*id.* at 8–10).

Respondent contends the state court's adjudication of Petitioner's ineffective assistance of trial counsel ("IATC") claim was not based upon an unreasonable determination of the facts, nor was the adjudication contrary to or an unreasonable application of clearly established federal law (ECF No. 7 at 8–10). Respondent argues Petitioner's trial counsel prevented all of Petitioner's post-arrest statements from being considered as evidence; therefore, Petitioner cannot show that defense counsel's performance was deficient or that Petitioner suffered prejudice (*id.*).

Respondent additionally contends there is no basis for an argument that the trial court erred by admitting evidence of Petitioner's post-arrest statements, because no testimony regarding Petitioner's custodial statements was actually admitted at trial (ECF No. 7 at 7–8). Respondent thus contends the First DCA reasonably applied clearly established federal law in denying the claim of trial court error presented as Ground Two of Petitioner's direct appeal (*id.*).

1.    IATC claim

As Issues One and Two of Petitioner's second amended Rule 3.850 motion, Petitioner argued that his trial counsel was ineffective for failing to seek pre-trial suppression of his post-arrest statements to law enforcement (Ex. L at 5–26).

a.    Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  To obtain relief under Strickland, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* at 687–88.  If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697.

The focus of inquiry under the performance prong of Strickland is whether counsel's assistance was reasonable considering all the circumstances and under prevailing professional norms. Strickland, 466 U.S. at 688–89, 691. "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en

banc)).  "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Strickland, 466 U.S. at 689. "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." Michael v. Crosby, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting Chandler, 218 F.3d at 1317).  Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" Id. (quoting Putman v. Head, 268 F.3d 1223, 1244 (11th Cir. 2001)).  "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so."  Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994).

As to the prejudice prong of the Strickland standard, Petitioner's burden of demonstrating prejudice is high. See Wellington v. Moore, 314 F.3d 1256, 1260 (11th Cir. 2002).  To establish prejudice, Petitioner must show "that every fair-minded jurist would conclude 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Jones

v. GDCP Warden, 753 F.3d 1171, 1184 (11th Cir. 2014) (quoting Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome," not that counsel's conduct more likely than not altered the outcome of the proceeding. *Id.* (citation omitted). And Petitioner must show that the likelihood of a different result is substantial, not just conceivable. Williamson v. Fla. Dep't of Corr., 805 F.3d 1009, 1016 (11th Cir. 2015) (citing Richter, 562 U.S. at 112). "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Strickland, 466 U.S. at 695. The prejudice assessment does "not depend on the idiosyncrasies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. *Id.* at 694–95. Further, when the claimed error of counsel occurred at the guilt stage of trial (instead of on appeal), Strickland prejudice is gauged against the outcome of the trial, not on appeal. *See* Purvis v. Crosby, 451 F.3d 734, 739 (11th Cir. 2006) (citing Strickland, 466 U.S. at 694–95).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice

components are mixed questions of law and fact. Strickland, 466 U.S. at 698; Collier

v. Turpin, 177 F.3d 1184, 1197 (11th Cir. 1999). "Surmounting Strickland's high bar

is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371, 130 S. Ct. 1473, 176

L. Ed. 2d 284 (2010). "Establishing that a state court's application of Strickland was

unreasonable under § 2254(d) is all the more difficult." Richter, 131 S. Ct. at 788.

As the Richter Court explained:

> The standards created by Strickland and § 2254(d) are both "highly
> deferential," and when the two apply in tandem, review is "doubly" so.
> The Strickland standard is a general one, so the range of reasonable
> applications is substantial. Federal habeas courts must guard against the
> danger of equating unreasonableness under Strickland with
> unreasonableness under § 2254(d). When § 2254(d) applies, the
> question is not whether counsel's actions were reasonable. The question
> is whether there is any reasonable argument that counsel satisfied
> Strickland's deferential standard.

*Id.* (citations omitted).

> b.      Federal Review of State Court Decision

The state circuit court adjudicated Petitioner's IATC claim as follows:

> THE COURT:  Really issue one and two are the same issue.  It's
> a claim that Mr. Ruiz [Petitioner's trial counsel] was ineffective for not
> moving to suppress the statement.  Some of the witnesses [at the
> evidentiary hearing] have been a little bit confused by the passage of
> time here as to what happened at trial.  I've reviewed the transcript.
>
> What happened at trial at Page 99 was there was a question asked
> by the prosecutor and elicited that Mr. McDavid admitted that he had

been at the Prince Murat. That was the only testimony presented in the case as to the statement. Mr. Ruiz immediately objected. The Court instructed the jury to disregard the statement.

Subsequent to that, there was a proffer of the predicate, that starts at Page 164, where the investigator—whose name escapes me now, she's changed her names a couple of times—Hollis at the time, set out the predicate for the statement. And there is a transcript, contrary to Mr. McDavid's contentions, of at least that portion of the statement in the court file.

The way I read Judge Cooper's [the trial judge] ruling, which is at Page 175 and 176, he ruled that the statement was properly admitted. But apparently the State agreed not to push it any further and the provision to the jury to disregard the testimony stood. I don't find that Mr. Ruiz in any way was ineffective.

Mr. McDavid keeps trying to tie the statement to the search. It is clear in the testimony, and it got a little confused here by what is her name? I'm sorry.

MS. RAY [the prosecutor]: Sullivan.

THE COURT: Sullivan. Ms. Sullivan, Investigator Sullivan. But I think it's crystal clear that at the time of the statement, based upon the proffer she made at the time of trial, that they already had the search warrant in hand. The search warrant makes no reference at all to Mr. McDavid's statement. There is no connection between the search warrant leading to the seizure of the computer and Mr. McDavid's statement. They're two totally separate issues.

I think Mr. McDavid's argument is that he consented because of that, them saying they had the search warrant. That doesn't appear to be the case based upon the testimony. And it's clear the search warrant was executed. Frankly, there is no ineffective assistance of counsel, no prejudice. I think Mr. McDavid is confused by the date and time on the

end of the search warrant. That's the return date. That's when it was executed. That doesn't mean when it was signed by Judge Shelfer.

You know, it's not unusual for police officers to have search warrants for several days before they're actually executed. So that doesn't mean that's when he signed it. I guess that's what the defendant is confused by. I don't find any ineffective assistance of counsel, nor any prejudice based upon issue one or two.

(Ex. O at 595–97). The First DCA affirmed the circuit court's decision without written opinion (Ex. Y).

The trial transcript supports the state court's finding of fact, that there was no evidence of Petitioner's custodial statements to law enforcement admitted into evidence at trial. At one point in the trial, the prosecutor asked Investigator Watson[7] whether Petitioner admitted he was at the Prince Murat motel on a specific date (Ex. S, Trial Transcript, p. 99). Investigator Watson answered, "Yes." (*id.*).[8] Petitioner's

---

[7] Investigator Kathy Watson's surname was Hollis at the time she investigated the case, Watson at the time she testified at Petitioner's trial, and Sullivan at the time she testified at the post-conviction evidentiary hearing.

[8] Thomasia Sumner testified that she and Petitioner viewed certain images on Petitioner's computer in a room at the Prince Murat motel on December 2–3, 2004 (Ex. C at 54–59). Ms. Sumner described the images as young children involved in sexual activity (*id.* at 58–59). Ms. Sumner testified that she asked Petitioner what about the images "turned him on," and Petitioner responded that the subjects were "young and tender" and had not been "tampered" with yet (*id.* at 59). Ms. Sumner testified that Petitioner was masturbating while they viewed the images (*id.* at 59–60). Ms. Sumner testified that Petitioner asked her to look for a girl to bring back to the motel room so they could get her high and "play" with her (*id.* at 66–68). Ms. Sumner identified Petitioner in a photographic line-up and in the courtroom as the man with whom she viewed the images at the motel (*id.* at 69–70). Law enforcement officers seized Petitioner's computer during execution of a search warrant (*id.* at 80–82). A forensic expert recovered images from Petitioner's computer and

counsel, Attorney Ruiz, objected to the testimony and moved for a mistrial, on the ground that the State failed to show that Petitioner's custodial statements were made after a knowing and voluntary waiver of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) (*id.* at 100). The trial court struck the prosecutor's question and Investigator Watson's answer, and directed the jury to disregard both the question and the answer (*id.* at 101).

During a proffer outside the presence of the jury, Investigator Watson testified regarding the circumstances of Petitioner's post-arrest interrogation, specifically, the circumstances surrounding Petitioner's being advised of his Miranda rights (*id.* at 103–08, 164–67). Attorney Ruiz renewed his motion for mistrial based upon the jury's hearing Petitioner's statement (specifically, his admission to Investigator Watson that he was at the Prince Murat motel on a specific date) without sufficient evidence that Petitioner knowingly and voluntarily waived his Miranda rights prior to making the statement (*id.* at 167–74). The trial court denied the motion for mistrial, on the ground that Petitioner made the statement about his being at the Prince Murat motel after he properly received Miranda warnings and waived his rights (*id.* at

---

copied them onto a disc (*see id.* at 84–86). A law enforcement officer printed photographs from the images on the disc and identified the photographs as State's Exhibits 2 through 79 (*id.* at 85–86, 88–89). The photographs were admitted into evidence (Ex. D at 141). A doctor testified that each of the images, with the exception of one (State's Exhibit 7), was an image of a child under the age of 12 (*id.* at 142–62).

174–75).  The court additionally noted that the prosecutor's question and Investigator Watson's answer were brief, and the jury was instructed to disregard both (*id.* at 175–76).

Later in the trial the prosecutor stated her intention, during a sidebar, to inquire of Investigator Watson as to whether Petitioner acknowledged, during his post-arrest statement, that the computer on which officers discovered child pornography was his computer (*see* Ex. S, Trial Transcript, pp. 181–82).  Attorney Ruiz objected on the ground that Petitioner's statements were made after Petitioner refused to answer questions by officers, and were thus involuntary under <u>Miranda</u> (*id.* at 182–83).  The court heard argument from counsel on the issue of whether Petitioner had unequivocally asserted his right to remain silent prior to making the statement about the computer, and the court listened to portions of Petitioner's videotaped statement (*id.* at 183–86, 211–31).  The court adjourned the proceedings for the day and instructed the attorneys to provide additional research on the issue by e-mailing him or providing copies the next morning (*id.* at 228–31).  The trial transcript of the proceedings the next morning does not include a ruling on the admissibility of Investigator Watson's testimony as to whether Petitioner acknowledged, during his post-arrest statement, that the computer on which officers discovered child

pornography was his (*see id.* at 234). The State rested its case without introducing any evidence of Petitioner's post-arrest statements to officers (*see id.* at 234–35, 260–61). Although the <u>Miranda</u> statement of rights signed by Petitioner and the videotape of his post-arrest statements to law enforcement were identified as State's Exhibits 83 and 84 for purposes of the record, they were not admitted as evidence (*see id.* at 243–44, 308).

The First DCA's rejection of Petitioner's IATC claim could have been based upon the theory that Petitioner failed to satisfy the prejudice prong of the <u>Strickland</u> standard with respect to Attorney Ruiz's failure to seek pre-trial suppression of Petitioner's post-arrest statements to law enforcement. The jury did not consider Investigator Watson's testimony that Petitioner admitted he was at the Prince Murat motel, because the judge struck the testimony and instructed the jury to disregard it. Additionally, the judge instructed the jurors to look only to the evidence introduced during trial for proof (Ex. A at 69, 75, 81; Ex. S, Trial Transcript, pp. 268, 277). Federal courts "presume that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them." <u>United States v. Olano</u>, 507 U.S. 725, 740, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993)

(alteration and quotation marks omitted).  Additionally, the State did not introduce any evidence that Petitioner acknowledged to police that he owned the computer.

Moreover, to the extent Petitioner contends Attorney Ruiz should have moved to suppress the computer and images obtained from it, Petitioner failed to show that the State could not have established, by a preponderance of the evidence, that there was a reasonable probability the evidence would have been discovered by lawful means.  The exclusionary rule requires suppression of "fruits" obtained "as a direct result" of an illegal search or an invalid interrogation.  *See* Wong Sun v. United States, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963).  However, the Supreme Court has carved out the following exception to the "fruit of the poisonous tree" doctrine:  when the prosecution can establish by a preponderance of the evidence that the information would have been ultimately recovered by lawful means, the evidence will be admissible.  *See* Nix v. Williams, 467 U.S. 431, 434, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984); Brewer v. Williams, 430 U.S. 387, 406 n.12, 97 S. Ct. 1232, 51 L. Ed. 2d 424 (1977); *see also* United States v. Virden, 488 F.3d 1317, 1322 (11th Cir. 2007); United States v. Roper, 681 F.2d 1354, 1358 (11th Cir. 1982).  There also must be a showing that "the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the illegal conduct."  Virden, 488 F.3d at 1322

(citing  Jefferson v. Fountain, 382 F.3d 1286, 1295 (11th Cir. 2004)); United States
v. Delancy, 502 F.3d 1297, 1315 (11th Cir. 2007) (citing Jefferson, 382 F.3d at
1296)); *see also* United States v. Burgos, 720 F.2d 1520, 1525 n.6 (11th Cir. 1983)
("Even if we were to find that the search was tainted by the Miranda violation, the
evidence would still be admissible under the 'inevitable discovery' exception to the
'fruit of the poisonous tree' doctrine."); Strickland v. Linahan, 72 F.3d 1531, 1537 n.5
(11th Cir. 1996) ("It is not clear whether Strickland was given Miranda warnings
before or after police, at the house, asked him where in the house the body was, but
it matters little since police were there to go into the house pursuant to his report to
them and search for a victim and would have done so.").

The state court record shows that on December 14, 2004, Investigator Hollis
swore out a complaint for issuance of a warrant for Petitioner's arrest based upon
information contained in Hollis' probable cause affidavit (Ex. A at 27–31).   The
complaint listed Petitioner's address as 1395 Jeffery Road, Tallahassee, Florida (*id.*
at 27).   The supporting probable cause affidavit stated that on December 11, 2004,
Thomasia Sumner told Investigator Hollis that Petitioner had a computer monitor,
tower, keyboard, and web camera in his car; that she helped Petitioner bring the
equipment into room #37 of the Prince Murat motel; and that Petitioner set up the

computer and showed Sumner images of child pornography (*id.* at 28–30). The affidavit stated that Ms. Sumner told Investigator Hollis that Petitioner lived in the Killearn Lakes area with his parents (*id.*). The affidavit further stated that records from the Prince Murat motel showed that Petitioner checked into room #37 on December 3, 2004 (*id.*). The motel records listed Petitioner's cell phone number, which was the same number that Thomasia Sumner provided to police as Petitioner's cell phone number (*id.*). The probable cause affidavit stated that Thomasia Sumner identified Petitioner in a photographic line-up on December 13, 2004, as the man with whom she went to the motel room (*id.*). The probable cause affidavit stated that Investigator Hollis ran an "Accurint" check on Petitioner and discovered that his parents' names were Millard and Beverly McDavid (*id.*). Hollis then ran the name "McDavid" through the property appraiser's web site and found that Millard and Beverly McDavid were listed as owners of 1395 Jeffery Road, which was in the general area of Killearn Lakes (*id.*). A judge reviewed the probable cause affidavit on December 15, 2004, and found sufficient probable cause for Petitioner's arrest (Ex. M at 287–91). Also on December 15, 2004, Investigator Hollis applied for and obtained a search warrant for the house at 1395 Jeffery Road (*see* Ex. U, Affidavit for Search Warrant, pp. 1–8, Search Warrant, pp. 1–4). The Affidavit for Search Warrant

did not mention any post-arrest statements by Petitioner to law enforcement—rather, it relayed only the information gathered by officers during their investigation up to and including December 13, 2004 (*id.*, Affidavit for Search Warrant, pp. 3–5). The judge signed the search warrant on December 15, 2004, authorizing officers to search for and seize computer hardware, computer software, data maintained on the computer, computer related storage devises, and the like (*id.*, Search Warrant, pp. 1–4).

According to a report authored by Officer Mary Berens of the Tallahassee Police Department, which is also part of the state court record, Berens was assigned to conduct surveillance at 1395 Jeffery Road on December 15, 2004, because Investigator Hollis was "attempting to arrest Stacey McDavid and conduct a Search Warrant at his residence, 1395 Jeffery Road" (Ex. M at 296). Officer Berens' report states that her assignment was to "set up" at the McDavid's residence and notify other officers if Petitioner left the residence (*id.*). Berens' report states that Captain Burke apprised the Leon County Sheriff's Office that the police department was conducting surveillance at the residence (*id.*). Officer Berens' report states that at approximately 3:10 p.m., she observed a black vehicle leave the McDavid residence (*id.*). Officer Berens notified other officers and followed the vehicle, and at approximately 3:24

p.m., the command was given to arrest Petitioner (*id.*). Petitioner was arrested and transported to the police station to be interviewed (*id.*). According to the report of another law enforcement officer, Investigator Mahoney, Petitioner was brought into the interview room of the police station at approximately 4:15 p.m. (*id.* at 297). Petitioner signed a Statement of Rights and Acknowledgment of Rights at approximately 4:16 p.m. (*id.* at 302).

Investigator Sullivan (formerly Hollis) testified at the post-conviction evidentiary hearing (Ex. O at 503–17). Investigator Sullivan testified that at the time she and Investigator Mahoney conducted Petitioner's post-arrest interview, which lasted for "hours," the judge had already signed the search warrant (*id.* at 509, 510–11, 516). It is evident from the transcript of the "first portion" of Petitioner's videotaped post-arrest interview (*see* Ex. M at 323–53), that at the time of the interview, officers were already at 1395 Jeffery Road with the search warrant (*id.* at 338–39, 343–44, 349–51).

According to the search warrant return, Sergeant Adams and other officers executed the search warrant at approximately 5:16 p.m. on December 15, 2004 (Ex. M at 295).

Regardless of when the officers actually executed the search warrant, the State could have established, by a preponderance of the evidence, that officers were actively pursuing the search warrant of the residence prior to Petitioner's arrest. As previously noted, all of the information included in the Affidavit for Search Warrant pre-dated Petitioner's arrest; indeed, the last bit of investigative information referenced in the Affidavit was dated December 13, 2004, which was two days prior to Petitioner's arrest (Ex. U, Affidavit for Search Warrant, pp. 3–5). The Affidavit identified the house to be searched and the evidence believed to be located therein, including computer equipment (*id.*, pp. 1–2). Investigator Hollis signed the Affidavit on December 14, 2004, and the judge issued the search warrant the next day. The search warrant authorized officers to search the home for computer equipment (Ex. U, Search Warrant). If Attorney Ruiz had sought to suppress the computer and the images discovered on it, the State could have established that there was a reasonable probability the computer would have been inevitably discovered during the lawful search.

Petitioner failed to show a reasonable probability that the evidence considered by the jury would have been any different if Attorney Ruiz had sought pre-trial suppression of Petitioner's post-arrest statements to law enforcement or the computer

(as "fruit" of the "poisonous" interrogation). Therefore, the state court's adjudication of Petitioner's IATC claim was not based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of <u>Strickland</u>.

            2.      <u>Claim of trial court error</u>

As Ground Two of Petitioner's direct appeal, he argued that the trial court erred when it allowed "presentation of evidence" of Petitioner's custodial statement and the issuance of the search warrant for the residence based upon Petitioner's unequivocal withdrawal of his waiver of his rights under <u>Miranda</u> (Ex. H at 13–19). Petitioner alleged that prior to speaking with Investigators Watson and Mahoney at the police station, the investigators advised him of his <u>Miranda</u> rights and he signed a written <u>Miranda</u> waiver form (*id.* at 13). Petitioner argued that at a certain point in the taped interview, he withdrew his consent to answer questions (*id.*). Petitioner asserted that the taped interview was "introduced" as State's Exhibit 84, and the pertinent portions of it were played for the court, specifically, the portions to which Attorney Ruiz objected at trial (*id.*). Petitioner argued that the statement and "the evidence seized by virtue of it should not have been introduced at trial" (*id.* at 19).

The First DCA affirmed Petitioner's conviction without written opinion. "[T]he summary nature of a state court's decision does not lessen the deference that it is due."

Wright v. Moore, 278 F.3d 1245, 1254 (11th Cir. 2002); *see also* Harrington, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). Where a state court denies relief without providing an explanation or its reasoning, the habeas petitioner must show that there was no reasonable basis for the state court's decision. *See* Harrington, 562 U.S. at 98. The federal court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. *See* Harrington, 562 U.S. at 102; *see also* Gill, 633 F.3d at 1292 (holding that the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Here, the First DCA's affirmance of Petitioner's conviction could have been based upon the theory that the jury did not consider any evidence of Petitioner's post-

arrest statements, and that all of the physical evidence admitted at trial was admissible pursuant to the inevitable discovery doctrine.  Petitioner has not shown that the First DCA's adjudication of the claim of trial court error "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Harrington, 562 U.S. at 103.

Petitioner failed to demonstrate that the state courts' adjudication of either his IATC claim or his claim of trial court error was based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of clearly established federal law.  Therefore, Petitioner is not entitled to federal habeas relief on Ground Two.

C.    Ground Three:  "The Petitioner was denied his right to effective assistance of trial and appellate counsel under the 6th Amendment to the U.S. Constitution when both lawyers failed to object or argue against the prosecutor's improper tactics, statements, and arguments throughout course of trial where said [sic] deprived Petitioner his rights under the U.S. Constitutions [sic] 5th, 6th and 14th Amendments; federal law [sic]; and holdings of the U.S. Supreme Court."

Petitioner contends trial counsel was ineffective for failing to object to the prosecutor's tactics, statements, and arguments, which constructively amended the information and permitted the jury to convict Petitioner of uncharged and non-existent crimes (ECF No. 1 at 10–11).  Petitioner contends appellate counsel was ineffective

for failing to raise an issue of the prosecutor's alleged misconduct on direct appeal (*id.*). Petitioner asserts he presented the IATC claim as Issue Four of his Rule 3.850 motion, and the claim regarding appellate counsel as the fourth claim of his petition alleging ineffective assistance of appellate counsel ("IAAC") (*id.* at 11–12).

Respondent contends neither Issue Four of Petitioner's Rule 3.850 motion nor Ground Four of his petition alleging IAAC fairly presented claims concerning trial counsel's failure to object to, and appellate counsel's failure to argue as to, the prosecutor's proceeding on crimes not charged in the information; therefore, those claims of ineffective assistance of trial and appellate counsel are unexhausted and procedurally barred (ECF No. 7 at 11–13).

The undersigned agrees with Respondent. The state court record demonstrates that Petitioner did not fairly present to the state courts a claim of IATC with regard to trial counsel's failure to object to the prosecutor's proceeding on uncharged and non-existent crimes and constructively amending the information (*see* Ex. L). Nor did Petitioner fairly present the state courts with an IAAC claim with respect to appellate counsel's failure to argue this issue on direct appeal (*see* Ex. BB). Therefore, to the extent Petitioner attempts to raise those claims here, they are unexhausted and procedurally barred.

Petitioner relies upon <u>Martinez v. Ryan</u>, 566 U.S. 1, 132, S. Ct. 1309, 182 L. Ed. 2d 272 (2012) to excuse his procedural default (*see* ECF No. 15). As previously discussed, a federal court may consider the merits of a procedurally defaulted claim if the petitioner can show both "cause" for the default and "prejudice" from a violation of his constitutional right. <u>Wainwright v. Sykes</u>, 433 U.S. 72, 84–85, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977). To establish cause, a petitioner must ordinarily "demonstrate 'some objective factor external to the defense' that impeded his effort to raise the claim properly in state court." <u>Ward v. Hall</u>, 592 F.3d 1144, 1157 (11th Cir. 2010) (quoting <u>Murray</u>, 477 U.S. at 488). Before its 2012 decision in <u>Martinez</u>, the Supreme Court had long held that § 2254 petitioners cannot rely on errors made by their state collateral counsel to establish cause. *See* <u>Coleman</u>, 501 U.S. at 752–53. <u>Martinez</u> created a limited, equitable exception to <u>Coleman</u> where, (1) "a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding," as opposed to on direct appeal; (2) "appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of <u>Strickland</u>"; and (3) "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one." <u>Martinez</u>, 566 U.S. at 14 (citations omitted). Accordingly, the petitioner must "establish that his collateral

counsel's conduct 'fell below an objective standard of reasonableness,' and that, 'but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Hittson v. GDCP Warden, 759 F.3d 1210, 1262 (11th Cir. 2014) (quoting Strickland, 466 U.S. at 688).

By its own terms, Martinez applies only to claims of ineffective assistance of trial counsel that are otherwise procedurally barred. *See* Gore v. Crews, 720 F.3d 811, 816 (11th Cir. 2013). Petitioner's reliance upon Martinez to excuse the procedural default of his ineffective assistance of appellate counsel claim is thus unavailing.

Further, Petitioner cannot demonstrate that the procedural default of his IATC claim was caused by the lack of post-conviction counsel or ineffectiveness on the part of post-conviction counsel. The state court record demonstrates that Petitioner knowingly and voluntarily rejected the state court's provision of post-conviction counsel, and Petitioner insisted on representing himself (*see* Ex. L at 176–81, 182, 185, 186, 187–90, 191). *See* Brink v. Wengler, No. 1:13cv39EJL, 2015 WL 874154, at *8 (D. Idaho Feb. 27, 2015) (Martinez did not apply where petitioner represented himself on post-conviction review as a result of his own choice) (unpublished but recognized as persuasive authority); Bender v. Wynder, No. 05-998, 2013 WL 3776746, at *4 (W.D. Pa. July 15, 2013) (unpublished) (Martinez did not apply to

excuse procedural default where petitioner elected to represent himself during his post-conviction proceedings despite state court's appointing him counsel). Therefore, Petitioner may not rely on <u>Martinez</u> to excuse the procedural default of his IATC claim.

Petitioner is not entitled to federal review of his IATC claim based upon trial counsel's failure to object to the prosecutor's proceeding on uncharged and non-existent crimes and constructively amending the information; nor is Petitioner entitled to review of his IAAC claim based upon appellate counsel's failure to raise an issue concerning the prosecutor's proceeding on uncharged and non-existent crimes and constructively amending the information.

To the extent Petitioner is claiming that trial counsel was ineffective for failing to object to improper prosecutorial comments during opening statements and closing arguments, Petitioner fairly presented that IATC claim as Issue Four of his second Rule 3.850 motion (Ex. L at 29–39). Additionally, Petitioner fairly presented an IAAC claim, based upon appellate counsel's failure to raise an issue on direct appeal concerning the prosecutor's allegedly improper comments during opening statements and closing argument (Ex. BB at 11–17, 30–55). The respective state courts

adjudicated the merits of those claims. Therefore, those claims are subject to review under § 2254(d).

1.     IATC claim

a.     Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs IATC claims.

b.     Federal Review of State Court Decision

In Petitioner's second amended Rule 3.850 motion, Petitioner identified the prosecutorial comments which he believed were erroneous, and Petitioner argued that Attorney Ruiz was ineffective for failing to object (Ex. L at 29–39).

Petitioner alleged the prosecutor misstated the facts and law when she made the following comments in her opening statement:

> You will hear testimony from witnesses, and one of the main witnesses in the case is a young lady named Thomasia Sumner, who is—we'll make no bones about it. She's a prostitute. She's 29 years old. For whatever reason, her life consists of prostituting herself for money and to support a drug habit.

> But this case is all about a man who preys on women like that, and children. Helpless people in this world. That's what this case is all about. That's what the evidence is going to show.

> And back in December of 2004, maybe a week before December 3rd of the year 2004, Thomasia Sumner was doing what she did. She was walking the streets, trying to make some money so that she could

buy some drugs to feed her cocaine habit, and she runs into the defendant in this case, Stacy [sic] McDavid.

Stacy McDavid is driving a car and picks her up and puts her in the car and there it begins.

. . . .

And it ends up with him asking Ms. Sumner, and Ms. Sumner agreeing to try to go out and find what he wants, which is a child. But on its face, the evidence—you might believe Ms. Sumner—you might not like that, based on the evidence, but what this courageous young woman did, even though the evidence will show she's a prostitute on the street, her concern when she ran into Mr. McDavid was for the child that man was seeking to find.

And what she did was she told him yes, I will get you that child, because after the discussion she had with the defendant, which you will hear about from her in a few minutes, she was afraid of this man. She was afraid that this man was going to go out on his own and find a child, so to the extent that she could, she wanted him to believe that she wanted to engage in this conduct with him.

But the fact is what she did was she left. She may be a prostitute, but the evidence will show she's a very intelligent young lady. She called the National Center for Exploited and Missing Children, and she reported what was going on to them, and she went on to keep in contact with this man over the next three, four, five days, because she was afraid if she didn't stay in contact with him and at least appear that she was trying to find this child for him that he would go out and find one on his own. . . .

She felt that they weren't working fast enough to do something, the national center, which I believe that's the number she called. They ultimately get involved in this case, but she went with him a third time. You will hear testimony that he picks her up the first time, then she is putting him off, call me later. He comes by at 6:00 in the morning,

brings her a beer.  She's like no, not yet, I haven't found anybody yet.
Call me back in a few days.

So he called back in four days.  What happens next is he picks her
up in a car and he's got computer equipment in the back of the car. . . .

And when they to [sic] the hotel, the motel, the Prince Murat, he
took her in there, he set up the computer, and you will hear about some
dialogue that's been going on in the context about what age child to [sic]
you want.  He never comes out and says I want you to bring me a six
year old.  It's—she's 17, 18, 19 he believes.  I want someone younger.
Well, how young?  I like them young.  How young?  I like them
younger.  The younger sister of a younger sister type stuff.  You will
hear all about that.

Bottom line, he gets on the computer and shows her what he likes,
and that is in the form of—he's not charged with all of the counts that he
could have been charged with, but we selected 79 of the images that
were on that computer as he sat there showing this obscene pornographic
material to this young lady, to show her what he wanted.
. . . .
I have no doubt at all that after you've seen the images and heard
the evidence in this case, you will have absolutely no other course but to
find this defendant guilty of exactly what he is guilty of, and that is
trying to procure sex with a child and 79–78 counts of child pornography
that he is actually charged with.

(Ex. L at 29–39; *see also* Ex. S, Trial Transcript, pp. 19–25).

Petitioner alleged the prosecutor also misstated the facts and law during closing

arguments.  The state court record reflects that defense counsel argued first during

closing arguments, and the prosecutor argued last (Ex. S, Trial Transcript, pp.

284–93).  Since the propriety of the prosecutor's arguments must be viewed in the

context of defense counsel's arguments, defense counsel's arguments are set forth here:

MR. RUIZ:  The issue here is a legal issue.  It's what I talked to you about in opening statement.  The issue is whether or not, as to Count 1, there was solicitation; and counts 2 through the rest of the counts with the exception of count 7, is whether there was possession of specific photographs.  So I'm not going to go into—you noticed from my case yesterday, I didn't cross examine Dr. Moorer.  I didn't do that.  We didn't do that to the jury.  You heard what Dr. Moorer what [sic] had to say.

The issue is a legal one, ladies and gentlemen.  Mr. McDavid has chosen to exercise his right to a jury trial, and I want to start off by going through the elements of each of the crimes with which he is charged, and going through the evidence, and the lack thereof, as to each one.

Count 1—you can follow along in your packet.  Count 1, reads solicitation to commit sexual battery on a person less than 12 years of age by a person over 18 years of age.  The judge has read to you, and I will briefly go over that.

To prove the crime of solicitation to commit sexual battery on a person less than 12 years of age by a person over 18 years of age, the State must prove the following two elements beyond a reasonable doubt.  One, between December 2nd, 2004 and December 3rd, 2004, Stacy J. McDavid solicited Thomasia Sumner to commit sexual battery on a person less than 12 years of age by a person over 18 years of age.

And you have to go down and see what some of the definitions mean, and that's what this next page goes into.  It describes solicit, meaning to ask earnestly or to try induce the person solicited to do the thing solicited.  Which then sends you back to the previous page, which is sexual battery at the bottom of count 1.

The crime of sexual battery on a person less than 12 years of age by a person over 18 years of age contains the following elements: one, the child was less than 12 years of age. What child are we talking about? We don't have a child. There's no child named. No specific child was given to you. No specific age was given to you. The only testimony you heard about that was a sister of a sister of a sister. But there's no specificity there at all as to exactly what the solicitation was supposed to have been.

Now, remember, it's your job to follow the law, and I told you earlier, this is not a popularity contest. It's an issue about following the law. You have all taken an oath to follow the law. If you don't follow the law, then there's a problem.

So I want you to look closely when they talk about soliciting someone to commit a sexual battery on a person less than 12 years of age, was there any testimony at all about this sexual battery? Any testimony about anyone and it tells you what a sexual battery is. It's the organ of the person or child penetrated or having union with the anus, vagina or mouth of the child. Section B, it could be the anus or vagina being penetrated by an object. That's the solicitation. You are going to have to find that he solicited someone to engage in this kind of act with specificity. And it's just not there.

The only evidence you have of any solicitation at all, ladies and gentlemen, came from Thomasia Sumner, and I'm not pronouncing her first name right, and I apologize. I believe it's Thomasia Sumner, who took the stand and she said the sister of a sister of a sister.

Well, that doesn't give you any specificity. It would be one thing if it was the daughter of a daughter of a daughter, maybe. But we have sister of a sister of a sister, with no specificity as to any particular person, no directive as to what they were going to engage in.

And remember, the information, the charge is specifically alleged as a sexual battery. This isn't alleged a touching. The State has chosen

to proceed on proving that was solicitation for sexual battery. And that's why the judge has included that information about the sexual battery in this charging document here, on these jury instructions for you to consider, and that's what you have to find.

Now, if you read it carefully, what it seems to say is that Stacy J. McDavid solicited Thomasia Sumner to commit a sexual battery on a person less than 12 years of age, and if you read under Count l number one, if you read it carefully, it seems to say Stacy J. McDavid solicited Thomasia Sumner to commit a sexual battery on a person less than 12, and that's what the jury instruction says, which even makes it less likely, because now what it seems to indicate is that you have to find that Mr. McDavid was soliciting Thomasia Sumner for her to commit a sexual battery on someone under the age of 12.

Clearly after hearing the testimony there's no evidence at all that Ms. Sumner is going to commit a sexual battery on anyone under the age of 12, clearly. So it doesn't matter which way you look at it, the evidence just doesn't seem to comport with the charge the State has come forward on with respect to the solicitation count, and those are the things you are going to have to find, and those are the elements the State is charged with proving.

Remember, each element must be proven beyond a reasonable doubt. You don't have to like my client. That's fine. It's not a popularity contest. The issue is the law. And the issue is whether or not the State has established a case as to the solicitation count beyond a reasonable doubt.
. . . .
It's difficult. No one is going to say it's easy. It's a difficult job to do that. Because some of you might be thinking to yourselves when you saw photo one, that's all I need to see. That's it. But that wouldn't be justice. That wouldn't be a fair trial. The issue is whether or not the State has proven the crimes its alleged with evidence. Not just that you think he did it. Not just that he might have done it, or he probably did

it. You have to be convinced beyond a reasonable doubt as to each count.

I would submit to you as to the solicitation count, the State has simply not met its burden of proof with respect to Count 1, based on the evidence.

(Ex. S, Trial Transcript, pp. 285–89).

The portions of the prosecutor's arguments which Petitioner alleged were objectionable were the following:

MS. RAY: . . . I'm going to start with Count 1. I'm not going to read the jury instructions to you. You have them with you. He is charged with—and when you go back, I do want you to look at those jury instructions. The State gladly takes on its burden in every case. But don't add to the burden. Some of the things Mr. Ruiz is talking about are not elements of the crime.
. . . .
The fact is that this defendant, beginning with the first count, solicited that prostitute to bring a child back to him, and for he and that child to have sex. The State is not charging the defendant with sexual battery on a child under 12. If we were, it would have been a completed act. We would have a child and would have a whole different count here.
. . . .
You don't have an allegation that either Mr. McDavid or Ms. Sumner either with his penis penetrated that child in some way, or a female on female, you know, a finger in the vagina, I don't know. There is no evidence of that because we're not here talking about a completed act.
. . . .
We're talking about a solicitation, Mr. McDavid trying to get this young woman, Ms. Sumner to go out and bring a child back to him so that she could play with the child and he could play with the child.
. . . .

If you can look at all the evidence and think that the defendant did not intend for that woman to come back with a child so he could sexually assault that child, then find him not guilty.

He brought her to that motel, set up his computer that he carries around with him, sat down and showed her what he wanted. I'm not going to show you any of these images during my closing arguments. . . . Every one of those children was not only—the ones that were presented in court, that he has been charged with officially in court, not one of those children was probably over the age of 12.
. . . .
Mr. McDavid didn't have to say go get me a six year old for Ms. Sumner to know that's exactly what he wanted. He offered to buy drugs so that her [sic] and Ms. Sumner could go play with this child.
. . . .
I don't think the State needs to say anything further. The defendant is guilty of every count he has been charged with. Do your job, and find him guilty.

(Ex. L at 29–39, *see also* Ex. S, Trial Transcript, pp. 32, 46–55).

Under Florida law, the standard for reviewing prosecutorial comments is the

following:

Wide latitude is permitted in arguing to a jury. Logical inferences may be drawn, and counsel is allowed to advance all legitimate arguments. The control of comments is within the trial court's discretion, and an appellate court will not interfere unless an abuse of such discretion is shown. A new trial should be granted when it is "reasonably evident that the remarks might have influenced the jury to reach a more severe verdict of guilt than it would have otherwise done." Each case must be considered on its own merits, however, and within the circumstances surrounding the complained-of remarks.

Breedlove v. State, 413 So. 2d 1, 8 (Fla. 1982) (quoting Darden v. State, 329 So. 2d 287, 289 (Fla. 1976)) (other citations omitted). The prosecutor may not, however, "'inflame the minds and passions of the jurors so that their verdict reflects an emotional response to the crime or the defendant rather than the logical analysis of the evidence in light of the applicable law.'" Jones v. State, 612 So. 2d 1370, 1374 (Fla. 1993) (quoting Bertolotti v. State, 476 So. 2d 130 (Fla.1985)). This state rule is essentially the same as the federal due process standard governing allegedly improper argument by the prosecution. A prosecutor may argue both facts in evidence and reasonable inferences from those facts. *See* Tucker v. Kemp, 762 F.2d 1496, 1506 (11th Cir. 1985) (citations omitted). But if the evidence is too insubstantial to support a reasonable inference, the prosecutor's comment will be deemed improper. *Id.* at 1507. Prosecutors must observe the distinction between the permissible practice of arguing evidence and suggesting inferences which the jury may reasonably draw from it and the impermissible practice of arguing suggestions beyond the evidence. *See* United States v. Simon, 964 F.2d 1082, 1086 (11th Cir. 1992) (citation omitted).

Furthermore, the prosecutor is not limited to a bare recitation of the facts; she may comment on the evidence and express the conclusions she contends the jury should draw from the evidence. United States v. Johns, 734 F.2d 657, 663 (11th Cir.

1984).  A prosecutor may comment on the uncontradicted or uncontroverted nature

of the evidence and may point out that there is an absence of evidence on a certain

issue during closing argument to the jury.  *See* <u>White v. State</u>, 377 So. 2d 1149 (Fla.

1980).  Additionally, prosecutorial comment upon a general lack of defense evidence

is permissible.  *See* <u>Smiley v. State</u>, 395 So. 2d 235 (Fla. 1st DCA 1981).

Attempts to bolster a witness by vouching for his or her credibility are improper

"if the jury could reasonably believe that the prosecutor indicated a personal belief in

the witness' credibility."  <u>United States v. Eyster</u>, 948 F.2d 1196, 1206 (11th Cir.

1991) (citing <u>United States v. Sims,</u> 719 F.2d 375, 377 (11th Cir. 1983)).  A jury could

believe that the prosecutor personally believed in the witness' credibility "if the

prosecutor either places the prestige of the government behind the witness, by making

explicit personal assurances of the witness' veracity, or the prosecutor implicitly

vouches for the witness' veracity by indicating that information not presented to the

jury supports the testimony."  *Id.* (citation omitted).  Thus, the court must examine

whether (1) the prosecutor explicitly personally assured the witness' credibility, or (2)

the prosecutor implicitly vouched for the witness' credibility by implying that

evidence not presented to the jury supports the witness' testimony.  <u>United States v.</u>

<u>Castro</u>, 89 F.3d 1443, 1457 (11th Cir. 1996) (citing <u>Sims</u>, 719 F.2d at 377).

However, it should be noted that "[t]he prohibition against vouching does not forbid prosecutors from arguing credibility . . . it forbids arguing credibility based on the reputation of the government office or on evidence not before the jury." United States v. Hernandez, 921 F.2d 1569, 1573 (11th Cir. 1991). Furthermore, when the prosecutor voices a personal opinion but indicates this belief is based on evidence in the record, the comment is not improper. United States v. Granville, 716 F.2d 819, 822 (11th Cir. 1983) (finding no prosecutorial misconduct where prosecutor, in effort to support testimony of two government witnesses, only pointed to matters in evidence: the demeanor of one witness and testimony of support witnesses, as well as a tape recording corroborating the testimony of another) (citations omitted). Likewise, a prosecutor may reply to remarks, comments or assertions made by defense counsel. See United States v. Young, 470 U.S. 1, 11–13, 105 S. Ct. 1038, 84 L. Ed.2 d 1 (1985) (when prosecutor's comments are an "invited reply" in response to defense counsel's own remarks, and she "[does] no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction") (citations omitted).

Finally, "the limits of proper argument find their source in notions of fairness, the same source from which flows the right to due process of law." Houston v. Estelle, 569 F.2d 372, 380 (5th Cir. 1978). "The relevant question is whether the

prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181, 106 S. Ct. 2464, 2471, 91 L. Ed. 2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974)).  Thus, to establish prosecutorial misconduct, a two-prong test must be satisfied:  (1) the prosecutor's comments must have been improper; and (2) the comments must have rendered the trial fundamentally unfair.  *See* Eyster, 948 F.2d at 1206 (citations omitted); Brooks v. Kemp, 762 F.2d 1383, 1400 (11th Cir. 1985) (en banc), *vacated on other grounds*, 478 U.S. 1016, 106 S. Ct. 3325, 92 L. Ed. 2d 732 (1986), *reinstated*, 809 F.2d 700 (11th Cir. 1987); Dessaure v. State, 891 So. 2d 455, 464–65 (Fla. 2004) (an order granting mistrial is required only when the error upon which it rests is so prejudicial as to vitiate the entire trial, making a mistrial necessary to ensure that the defendant receives a fair trial).  These rules apply to comments made during both opening statements and closing arguments.  *See* Cargill v. Turpin, 120 F.3d 1366, 1380 (11th Cir. 1997) (finding that even though prosecutor's comments during opening statements were improper, they were not "overly prejudicial," noting that defense counsel failed to object to any of the comments, both prosecutor and defense counsel clearly and repeatedly stated that their

opening and closing remarks did not constitute evidence, and trial court gave distinct instructions to the same effect).

During the post-conviction evidentiary hearing, Attorney Ruiz testified that he made tactical decisions as to whether to make objections (Ex. O at 543, 558). Attorney Ruiz additionally testified that he did not believe that the comments identified by Petitioner were improper (*id.* at 558).

At the conclusion of the evidentiary hearing, the circuit court denied relief on Petitioner's IATC claim for the following reasons:

> A failure to object to improper comments by the prosecutor. Mr. Ruiz indicated that he made a strategy decision not to object to any comments by the prosecutor. Frankly, I don't find that any of the comments cited are improper. But to the extent—you know, sometimes there can be some close lines as to what's proper or improper, I accept that it was a reasonable strategy on Mr. Ruiz's part not to object. I don't find any ineffective assistance fo counsel or any prejudice.

(Ex. O at 597–98). On appeal to the First DCA, the appellate court affirmed the decision (Ex. Y).

Petitioner failed to show that Attorney Ruiz's failure to object to the prosecutorial comments that Petitioner identified constituted deficient performance. Upon review of the entirety of the comments by the prosecutor and defense counsel during opening statements and closing arguments, and in the context of the evidence

adduced at trial, the state court reasonably concluded that Attorney Ruiz's failure to object was not unreasonable.

Additionally, the state court reasonably concluded that Petitioner failed to demonstrate he was prejudiced by Attorney Ruiz's failure to object. It is evident from the trial transcript that the trial court instructed the jury, both at the commencement of trial and at its conclusion, that their verdict must be based solely on the evidence, or lack of evidence, and the law (*see* Ex. S, Trial Transcript, pp. 14, 16, 277–78). Further, the trial court specifically instructed the jury that the lawyers' statements during opening statements and closing arguments were not evidence, and the jury should not consider them as such (*see id.*, pp. 15, 19, 280–81). Defense counsel reiterated this during his opening statement by reminding the jury that what the prosecutor said during her opening statement was not evidence (*see id.*, p. 25). The state court reasonably concluded that Petitioner failed to show a reasonable probability that the result of trial would have been different if Attorney Ruiz had objected to the prosecutor's comments.

The state court's adjudication of the IATC claim presented in the § 2254 petition as Ground Three was based upon an unreasonable factual determination, or

contrary to or an unreasonable application of <u>Strickland</u>.  Therefore, Petitioner is not

entitled to federal habeas relief on his IATC claim.

        2.    <u>IAAC claim</u>

          a.    Clearly Established Federal Law

      The standard for evaluating IAAC claims is the standard set forth in <u>Strickland</u>.

*See* <u>Smith v. Robbins</u>, 528 U.S. 259, 285, 120 S. Ct. 746, 764, 145 L. Ed. 2d 746

(2000) (citation omitted).  As previously discussed, the two components of an

ineffectiveness claim under <u>Strickland</u> are performance and prejudice, and if an

insufficient showing is made as to one, the court need not address the other.

<u>Strickland</u>, 466 U.S. at 697.  The focus of inquiry under the performance prong of

<u>Strickland</u> is whether counsel's assistance was "reasonable considering all the

circumstances." *Id.* at 691.  Appellate counsel who file a merits brief need not (and

should not) raise every nonfrivolous claim but, rather, may select from among them

in order to maximize the likelihood of success of on appeal.  <u>Jones v. Barnes</u>, 463 U.S.

745, 753–54, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983) ("Experienced advocates since

time beyond memory have emphasized the importance of winnowing out weaker

arguments on appeal and focusing on one central issue if possible, or at most on a few

key issues.").  To demonstrate prejudice, petitioner must show a reasonable

probability that, but for his counsel's unreasonable failure to brief a particular issue, petitioner would have prevailed on appeal. *See* <u>Robbins</u>, 528 U.S. at 285.

The Eleventh Circuit has issued several decisions interpreting the <u>Strickland</u> standard with regard to IAAC claims. Appellate counsel cannot be deemed ineffective for failing to raise issues "reasonably considered to be without merit." <u>United States v. Nyhuis</u>, 211 F.3d 1340, 1344 (11th Cir. 2000) (quoting <u>Alvord v. Wainwright</u>, 725 F.2d 1282, 1291 (11th Cir. 1984)). Additionally, where an issue is not preserved for appellate review, appellate counsel's failure to raise the issue is not constitutionally deficient as it is based on the reasonable conclusion that the appellate court will not hear the issue on its merits. <u>Diaz v. Sec'y Dep't of Corrs.</u>, 402 F.3d 1136, 1142 (11th Cir. 2005); <u>Atkins v. Singletary</u>, 965 F.2d 952, 957 (11th Cir. 1992); <u>Francois v. Wainwright</u>, 741 F.2d 1275, 1285–86 (11th Cir. 1984). Moreover, the arguments omitted from the appeal must have been significant enough to have affected the outcome of the appeal. <u>Nyhuis</u>, 211 F.3d at 1344 (citing <u>Miller v. Dugger</u>, 858 F.2d 1536, 1538 (11th Cir.1988)).

b.     Federal Review of State Court Decision

As the fourth IAAC claim presented in Petitioner's petition alleging IAAC, Petitioner claimed that his appellate counsel was ineffective for failing to argue that

fundamental error occurred by virtue of the prosecutor's alleged gross misstatements

of law, improper argument, improper comments, and misstating the evidence (Ex. BB

at 30–55). In support of his claim, Petitioner identified the same allegedly improper

comments as identified *supra* in the discussion of Petitioner's related IATC claim.

Additionally, as Ground Two of Petitioner's petition alleging IAAC, Petitioner

claimed that his appellate counsel was ineffective for failing to raise a preserved issue

concerning a "Golden Rule" violation and the trial court's denial of defense counsel's

motion for mistrial based upon the violation (*id.* at 11–17). The First DCA rejected

Petitioner's IAAC claims on the merits without explanation (Ex. CC).

It is apparent from the record that the only instance of alleged prosecutorial

misconduct, during opening statements and closing arguments, preserved for appellate

review was the following:

> MS. RAY: Now for those of you who have children, and I think
> most of you do, there are—

> MR. RUIZ: Objection, Your Honor.

> THE COURT: Sustained. Please disregard any comments about
> any personal circumstances of the jury.

> MS. RAY: We talked about children in jury selection, and I think
> the answers to most of the questions from the jury was most jurors on the
> panel had children. There are many ways to communicate without
> speaking. Children don't normally speak sometimes until they're up to

the age of two, but people, mothers, fathers, other children know children's needs.

They can communicate what they want in other ways. You don't have to say, at one year old, or six months old, when you're hungry, "I want some dinner," for us to know that the child wants to eat. And it's the same thing with anything else, and it's the same thing in this case.

The defendant didn't have to say go out and get me a six year old, bring her back here so that you can have sexual intercourse with her in some way, and I can have sexual intercourse with her in some way. You have to look to the evidence.

(Ex. S, Trial Transcript, pp. 296–97). After closing arguments, Attorney Ruiz requested a sidebar and moved for a mistrial based upon the comment to which he objected (*id.*, p. 299). The trial court denied the motion for mistrial, on the following grounds (1) the comment was a "very small portion" of the prosecutor's argument, (2) the comment was not a focal point or emphasized, (3) defense counsel immediately objected, and (4) the court immediately gave a curative instruction for the jury to disregard the comment (*id.*).

Appellate counsel's failure to raise an issue about any of the prosecutor's comments to which Attorney Ruiz did not object was not constitutionally deficient, since any error with respect to each of those comments was not preserved for appellate review. *See* Diaz, 402 F.3d at 1142; Atkins, 965 F.2d at 957; Francois, 741 F.2d at 1285–86. With respect to the alleged error that was preserved, *i.e.*, the prosecutor's

comment, "Now for those of you who have children, and I think most of you do, . . .", the trial court <u>sustained</u> Attorney Ruiz's objection, so the only issue that could have been raised on appeal was one of trial court error with respect to the denial of defense counsel's motion for mistrial.

For appellate counsel to succeed on that issue, counsel had to demonstrate that the prosecutor's comment was so prejudicial as to vitiate the entire trial, making a mistrial necessary to ensure that Petitioner received a fair trial. *See* <u>Dessaure</u>, 891 So. 2d at 464–65. The First DCA could have reasonably concluded that Petitioner failed to show a reasonable probability of success on appeal if appellate counsel had raised the mistrial issue. In light of the immediacy of Attorney Ruiz's objection, the trial court's curative instruction (that the jury should disregard any comments about the jurors' personal circumstances), and the prosecutor's then framing her comment as an example of people using non-verbal communication (*i.e.*, children communicating their wants even though they are too young to speak) to suggest that Petitioner's showing the images of child pornography to Ms. Sumner while he masturbated communicated to Sumner that he wanted her to find a young child with whom he could have sexual contact, the First DCA reasonably concluded that Petitioner failed to show he was prejudiced by appellate counsel's failure to raise the mistrial issue.

Petitioner failed to demonstrate that the state courts' adjudications of his IATC and IAAC claims with respect to the prosecutor's comments during trial were contrary to or an unreasonable application of <u>Strickland</u>, or based upon an unreasonable determination of the facts. Therefore, Petitioner is not entitled to federal habeas relief on Ground Three.

> D.   Ground Four: "The Petitioner was denied his right to effective assistance of trial and appellate counsel under the 6th Amendment to the U.S. Constitution when both lawyers failed to object or argue against a defective information and the court and prosecutor's constructive amendments to said information; said [sic] deprived Petitioner his rights under the U.S. Constitutions [sic] 5th, 6th and 14th Amendments; federal law [sic]; and holdings of the U.S. Supreme Court."

Petitioner alleges Attorney Ruiz was ineffective for failing to object to the second amended information as defective (because it charged him with soliciting himself to commit a sexual battery), failing to object to the court's permitting the prosecutor to re-open the State's case to present evidence of Petitioner's age (which was an essential element of the sexual battery that Petitioner was accused of soliciting himself to commit), and failing to object to constructive amendment of the information (ECF No. 1 at 13). Petitioner also claims that appellate counsel was ineffective for failing to raise these issues on direct appeal (*id.*). Petitioner asserts he

presented Ground Four as the third issue in his petition alleging IAAC and Issue Three of his Rule 3.850 motion (*id.* at 13–15).

Respondent asserts an exhaustion defense.  Respondent contends Petitioner's IAAC claim was not presented in the third issue of his petition alleging IAAC; therefore, the IAAC claim was not fairly presented to the state courts (ECF No. 7 at 14).  Respondent contends Ground Three of Petitioner's Rule 3.850 motion alleged a claim of trial court error, not IATC (*id.* at 15).

The state court record demonstrates that in Petitioner's second amended Rule 3.850 motion, Petitioner did not fairly and properly present an IATC claim based upon trial counsel's failure to object to the second amended information as defective, failing to object to the court's permitting the prosecutor to re-open the State's case to present evidence of Petitioner's age, or failure to object to constructive amendment of the information.  Petitioner presented to the circuit court only a claim of <u>trial court error</u> with respect to permitting the State to proceed on a defective information, permitting the State to re-open its case, and permitting constructive amendment of the information (*see* Ex. L at 27–28).  In ruling on the second amended Rule 3.850 motion, the circuit court adjudicated only the claim presented by Petitioner, *i.e.*, one of trial court error (Ex. O at 597).  Although Petitioner attempted to expand the claim

on appeal to include a claim of IATC with respect to the alleged errors (*see* Ex. V at 34–50), the State's answer brief argued only the claim that Petitioner presented below, *i.e.*, the claim of trial court error, with a caveat that if the First DCA considered Petitioner's newly presented IATC claim, the claim was without merit because there was no underlying error to support a meritorious objection by defense counsel (*see* Ex. W at 39–50).

It is well established that a Florida appellate court reviewing a circuit court's ruling on a Rule 3.850 motion will not consider claims which were not presented to the circuit court. *See* State v. Jackson, 204 So. 3d 958, 962 (Fla. 5th DCA 2016) ("Our review on appeal [of a lower court's order on a Rule 3.850 motion] is limited to issues actually presented to and decided by the lower court."); Wyche v. State, 624 So. 2d 830, 831–32 (Fla. 1st DCA 1993). Here, Petitioner did not present the circuit court with an IATC claim based upon trial counsel's failure to object to the second amended information as defective, failing to object to the court's permitting the prosecutor to re-open the State's case, and failing to object to constructive amendment of the information. Therefore, the IATC claim presented in Ground Four is procedurally barred. Although Petitioner relies upon Martinez, he cannot demonstrate that the procedural default was caused by the lack of post-conviction counsel or

ineffectiveness on the part of post-conviction counsel, because, as previously discussed, Petitioner knowingly and voluntarily rejected the state court's provision of post-conviction counsel, and he insisted on representing himself. Petitioner has not demonstrated cause and prejudice to overcome the procedural bar. Therefore, he is not entitled to federal review of his IATC claim based upon trial counsel's failure to object to the second amended information as defective, failing to object to the court's permitting the prosecutor to re-open the State's case to present evidence of Petitioner's age, and failing to object to constructive amendment of the information.

Additionally, the only related IAAC claim that Petitioner fairly presented to the state courts was a claim that appellate counsel failed to argue the "preserved issue" of the trial court's failure to grant a motion for judgment of acquittal ("JOA") on the solicitation count (*see* Ex. BB at 18–30). Petitioner did not fairly present an IAAC claim based upon appellate counsel's failure to argue that the information was defective, or that Petitioner's conviction was based upon a constructive amendment of the information. Therefore, those IAAC issues are procedurally defaulted. Petitioner has not shown cause for the failure to present these issues to the First DCA in his petition alleging ineffective assistance of appellate counsel. As previously discussed, Martinez is limited to claims of ineffective assistance of trial counsel that

are otherwise procedurally barred due to the ineffective assistance of post-conviction counsel. *See* Gore, 720 F.3d at 816. Moreover, even if Petitioner fairly presented those IAAC claims to the First DCA in his petition alleging IAAC, the state court reasonably rejected them, because those issues were not preserved in the trial court for direct appeal. *See* Diaz, 402 F.3d at 1142; Atkins, 965 F.2d at 957; Francois, 741 F.2d at 1285–86.

With regard to the IAAC claim which Petitioner fairly presented to the state court, *i.e.*, appellate counsel's failure to argue the "preserved issue" of the trial court's failure to grant a motion for JOA on the solicitation count, the First DCA reasonably rejected this IATC claim. On direct appeal, appellate counsel did argue that the trial court erred by denying defense counsel's motion for JOA and allowing the State to reopen its case (Ex. H at 9–12). Because Petitioner's appellate counsel made the argument that Petitioner faults him for not making, the First DCA reasonably rejected Petitioner's IAAC claim.

> E.    Ground Five: "The Petitioner was denied his right to effective assistance of trial and appellate counsel under the 6th Amendment to the U.S. Constitution when counsel failed to familiarize himself with or move in any way to test or sever critical, voluminous, highly prejudicial, and irrelevant inadmissible evidence thereby depriving Petitioner of his rights under the U.S. Constitutions [sic] 5th, 6th and 14th Amendments; federal law [sic]; and holdings of the U.S. Supreme Court."

In Ground Five, Petitioner raises three sub-claims of IATC (ECF No. 1 at 15–16). Petitioner contends trial counsel, Attorney Ruiz, was ineffective for failing to move to in limine to exclude each photograph which was subject to attack under Florida Statutes § 90.403 as irrelevant and unduly prejudicial. Petitioner additionally contends Ruiz was ineffective for failing to impeach Thomasia Sumner's testimony that she viewed each of the 78 images of child pornography on Petitioner's computer in the motel room on December 2–3, 2004. Petitioner alleges he presented evidence at the post-conviction evidentiary hearing that some of the images were created on Petitioner's computer after he and Ms. Sumner were in the motel room on December 3, 2004. Petitioner contends Attorney Ruiz was also ineffective for failing to "move to sever" the images created after December 3, 2004, on the ground that they were irrelevant to the solicitation charge, because they were not "connected by testimony or date" to the solicitation charge" (*id.*). Petitioner asserts he presented this claim to the state courts as Issue Five of his Rule 3.850 motion (*id.* at 15–17).

Respondent contends the only IATC claim that Petitioner fairly and properly presented to the state courts in Issue Five of his second amended Rule 3.850 motion was a claim based upon Attorney Ruiz's failure to seek severance of the solicitation charge from the remaining charges (ECF No. 17–18). Therefore, any other IATC

claims that Petitioner attempts to present here are unexhausted and procedurally barred (*id.*). Respondent contends that to the extent Petitioner is claiming that Attorney Ruiz was ineffective for failing to seek severance of the solicitation charge from all of the other charges, the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (*id.* at 17–19).

The court agrees with Respondent's exhaustion argument. In Ground Five of Petitioner's second amended Rule 3.850 motion, Petitioner presented only an IATC claim based upon Attorney Ruiz's failure to move to sever the solicitation count (Count 1) from the other counts (Counts 2 through 79), on the ground that the child pornography was not relevant or connected to the solicitation charge, and the evidence supporting the pornography charges (*i.e.*, the images) was unduly prejudicial with respect to the solicitation charge (*see* Ex. L at 40–43). In ruling on the Rule 3.850 motion, the circuit court adjudicated only the claim presented by Petitioner, *i.e.*, trial counsel was ineffective for failing to move for severance of the solicitation count from all of the other counts (Ex. O at 598). Therefore, that is the only IATC claim that satisfies the exhaustion requirement, and the other claims are procedurally barred.[9]

---

[9] For the reasons discussed *supra*, Petitioner's reliance upon <u>Martinez</u> to excuse the procedural default of any IATC claims is unavailing.

The state circuit court adjudicated the IATC claim as follows:

> Failure to move to sever, I don't find that a severance would have been granted. Had it been granted, I find that the photos would have been admissible by in large [sic], maybe not all of them, but at least some of them in the solicitation charge. Mr. Ruiz said he made a strategy decision not to give the jury two shots at convicting Mr. McDavid. That certainly was not an unreasonable strategy. I don't find that Mr. McDavid was prejudiced by the strategy decision by Mr. Ruiz.

(Ex. O at 598). The First DCA affirmed the decision without written opinion (Ex. Y).

Jennifer Roeder, who worked in computer evidence recovery with the Florida Department of Law Enforcement, testified at the post-conviction evidentiary hearing (Ex. O at 444–60). Petitioner questioned Ms. Roeder regarding 13 of the 78 computer files from which the images of child pornography admitted at Petitioner's trial were printed (*id.* at 454–60). Of the 13 files about which Petitioner inquired, Ms. Roeder testified that 8 of them were created after the date Ms. Sumner viewed images of child pornography on Petitioner's computer (December 2–3, 2004) (*id.*). Ms. Roeder testified that 5 of the 13 files were created on December 2 or 3 of 2004 (*id.*).

Petitioner questioned Attorney Ruiz as to why he did not move to sever the solicitation charge from the other charges (Ex. O at 543). Attorney Ruiz testified that he made a tactical decision not to move to sever, because, "I didn't feel giving the jury two chances to convict you [Petitioner] was good strategy." (*id.* at 543–44). Ruiz also

testified that he did not believe he had a meritorious basis for seeking severance of the solicitation count from the other counts (*id.* at 560). Ruiz testified that the images of the child pornography shown to Ms. Sumner by Petitioner at the motel were prejudicial, but he believed they were relevant to the issue of the type of child Petitioner wanted Ms. Sumner to bring back to the motel to get high or drunk and have sex with (*id.*).

"The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact, and a state court's decision concerning that issue is presumptively correct." Provenzano v. Singletary, 148 F.3d 1327, 1330 (11th Cir. 1998). Here, the state court record supports the circuit court's factual finding that Attorney Ruiz made a tactical decision not to seek severance of the solicitation charge from the remaining charges. The remaining question is whether the state court reasonably concluded that Attorney's Ruiz's tactical decision was reasonable.

Although an ineffective assistance of counsel claim is a federal constitutional claim which the court considers in light of the clearly established law of Strickland, when "the validity of the claim that [counsel] failed to assert is clearly a question of state law, . . . we must defer to the state's construction of its own law." Alvord v.

Wainwright, 725 F.2d 1282, 1291 (11th Cir. 1984) (explaining, in the context of an ineffective assistance of appellate counsel claim, that "[o]n the one hand, the issue of ineffective assistance—even when based on the failure of counsel to raise a state law claim—is one of constitutional dimension," but, "[o]n the other hand, the validity of the claim [counsel] failed to assert is clearly a question of state law, and we must defer to the state's construction of its own law.") (citations omitted)[10]; *see also* Callahan v. Campbell, 427 F.3d 897, 932 (11th Cir. 2005) (holding that defense counsel cannot be deemed ineffective for failing to make a state-law-based objection when the state court has already concluded that the objection would have been overruled under state law; to conclude otherwise would require the federal habeas court to make a determination that the state court misinterpreted state law, which would violate the fundamental principle that federal habeas courts should not second-guess state courts on matters of state law); Herring v. Sec 'y Dep't of Corr., 397 F.3d 1338, 1354–55 (11th Cir. 2005) (denying federal habeas relief on ineffective assistance claim based on counsel's failure to make state law-based objection; holding that the Florida Supreme Court's conclusion that the proposed objection would have been overruled was binding and precluded federal habeas relief on the ineffective assistance claim:

---

[10] Alvord was superseded by statute on other grounds as noted in Hargrove v. Solomon, 227 F. App'x 806 (11th Cir. 2007).

"The Florida Supreme Court already has told us how the issues would have been resolved under Florida state law had [petitioner's counsel] done what [petitioner] argues he should have done . . . . It is a 'fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters.'") (alterations in original) (quoting Agan v. Vaughn, 119 F.3d 1538, 1549 (11th Cir. 1997)).

Here, as in Alvord, Callahan, and Herring, the state court has already answered the question of whether there was a meritorious basis for severing the solicitation charge from the possession of child pornography charges—there was not. Furthermore, the state court determined that, as a matter of state law, even if the solicitation charge had been severed, at least some of the photographs would have been admissible at trial on the solicitation charge, because they suggested the type of person Petitioner wanted Thomasia Sumner to bring back to the motel room and the type of activity Petitioner wished to engage in. This court must defer to the state court's determination of state law. The failure by Petitioner's counsel to raise the severance issue cannot be deemed deficient performance, and Petitioner cannot show he was prejudiced by counsel's failure to raise the issue, because it had no arguable basis for success. In light of these determinations, the state court reasonably

concluded that Attorney Ruiz's tactical decision not to seek severance of charges was reasonable trial strategy.

Petitioner failed to demonstrate that the state court's adjudication of the exhausted portion of Ground Five was based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of <u>Strickland</u>. Therefore, Petitioner is not entitled to relief on this claim.

> F.    Ground Six: "The Petitioner was denied his right to effective assistance of trial and appellate counsel under the 6th Amendment to the U.S. Constitution when counsel erroneously advised and interfered with Petitioner's right to testify at trial thereby depriving Petitioner of his rights under the U.S. Constitutions [sic] 5th, 6th and 14th Amendments; federal law [sic]; and holdings of the U.S. Supreme Court."

Petitioner alleges he wanted to testify at trial on his own behalf (ECF No. 1 at 17).  Petitioner alleges Attorney Ruiz advised against it, because he feared the State would then use Petitioner's post-arrest statements to officers (*id.* at 18).  Petitioner contends this was unreasonable advice, because his post-arrest statement was inadmissible both as substantive evidence and for impeachment (ECF No. 1 at 18; ECF No. 15 at 26).  Petitioner alleges if he had testified, he would have used his trial testimony as "a sort of pulpit for his ideas" (ECF No. 15 at 25).  Petitioner further states:

Plus, he [Petitioner] wanted to explain his side of the story, as the only chance to win at this trial was to rebut and expound upon the testimony of the State's primary witness, Ms. Sumner, while pointing out to the jury that he was talking with Sumner about taking pictures of her kids to make money on legal modeling sites, and that when the Petitioner asked for another girl for a threesome it was for a young adult, and for Sumner to speculate an 11 year old was ridiculous, and that the Petitioner never said "younger the better", and that she had already found a girl for us. But that she wanted Petitioner to get his computer so she could better understand why her grandfather raped her, and that Petitioner explained to her that he would do that but he specifically wanted to show her the legal modeling sites as he did not want her to misunderstand his intentions. But when he showed her those legal websites she asked to look online for child pornography because she wanted to know why men like her grandfather sexually abused children, when in actuality, she was working as an agent for, and gathering evidence for law enforcement. Essentially, the Petitioner wanted, and deserved, to tell his side of the story. And being that the record shows him to be intelligent, facile, articulate, and well behaved, there is no doubt he would've acted appropriately, and caused any single member of the jury to believe him instead of her and come to a not guilty verdict. More of the type of things he may have wanted to say, and his nerve and tenacity to do so in the face of adversity, can be seen at sentencing.

(ECF No. 15 at 25–26) (references to trial and sentencing transcripts omitted).

Respondent contends the state court's adjudication of Petitioner's IATC claim was not contrary to or an unreasonable application of clearly established federal law (ECF No. 7 at 19).

1.    Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

2.      Federal Review of State Court Decision

Petitioner raised this claim as Issue Eight in his second amended Rule 3.850

motion (Ex. L at 49–52).  The state circuit court adjudicated the claim as follows:

> Issue eight, the defendant claims that Mr. Ruiz was ineffective for advising the defendant not to testify.  Frankly, that's absurd.  I think had Mr. McDavid gotten in front of the jury and shared some of his views, it would have been suicide on his part.  I don't find that that was an unreasonable strategy decision, nor that Mr. McDavid was prejudiced.
>
> It's crystal clear that Mr. McDavid knew he had a right to testify.  Judge Cooper went over that with him.  On Page 254 through 256 [of the trial transcript], Judge Cooper went over with the defendant, made sure that he understood he had a right to testify.  He chose not to.  There's been nothing established here that Mr. Ruiz did anything improper.  I would note, you know, the suggestion is had the statement been suppressed that might have made a difference.  I think the court would understand clearly that the issue of admissibility of statements is different for rebuttal than it is on a case in chief.
>
> The statement, even if you know, and it's unclear that it was inadmissible to start with, but it's a whole different standard on rebuttal and I believe it would have been admissible.

(Ex. O at 599–600).  The First DCA affirmed the decision without written opinion

(Ex. Y).

At the post-conviction evidentiary hearing, Attorney Ruiz testified that prior to

trial, Petitioner was evaluated by two doctors, Dr. Harry McClaren and Dr. Terrence

Leland (Ex. O at 560–61).  Attorney Ruiz testified that the report  of Dr. McClaren

and Dr. Leland "absolutely" factored into his opinion as to whether Petitioner should

testify at trial (*id.* at 561). The reports of these doctors were admitted into the record

at the evidentiary hearing (*id.*).

The report of Dr. McClaren included the following observations and

conclusions:

> Mr. McDavid willingly cooperated with the examiner during the evaluation and appeared to be very frank and straightforward in his description fo [sic] many of his attitudes. Also, he did not appear hesitant in regard to discussing issues of sexuality taken together with his recollections of his behavior near the time period of the alleged offense.
> . . . .
> He talked about how his difficulties were due to "losing everything due to my opinions." He talked about how he had refused in the past to "bow down" to bosses and expressed many angry feelings towards African Americans, especially those involved in crime and corruption.
> . . . .
> [H]e certainly gave the impression of being a very intense individual making good eye contact and appearing very invested in communicating his ideas from his opinions from [sic] descriptions of the behavior of Thomas Jefferson to historical changes in appropriate sexual behavior going back to ancient times.
> . . . .
> He was very interested in the internet and advised, at one point, that he was a "sex addict." He gave details of his sexual past history and probably meets the diagnostic criteria for pedophilia and may meet the criteria for Paraphilia, Not Otherwise Specified.
> . . . .
> His speech was coherent and understandable with no looseness of mental associations. At times his speech was a bit rambling when he was very intensely expressing his views. He definitely was preoccupied with sexual issues and mistreatment by women and black people.

. . . .

He was able to give a coherent description of his behavior during the time period of the alleged offense and should be able to relate his memories to his lawyer.  He should be able to plan a defense consistent with the reality of his situation.  He initially gave the impression as probably being an individual who would have significant difficulty in this regard, but after psychometric testing and lengthy conversation with the examiner he advised that he planned to strongly consider her [sic] lawyer's advice in regard to handling his charges.  He advised that there was some possibility that he might use his current legal situation as a sort of pulpit for his ideas in regard to various perceived injustices in the world of which he spoke at great length to this examiner.

. . . .

He had the capacity to manifest appropriate courtroom behavior.  Again, if he perceives himself as likely being convicted then there is a possibility that he might express his strong views in a Court context cannot [sic] be completely ruled out.  He said that he believed that the American justice system was "one of the best" but he went on to say that "the best isn't perfect."  He should be able to testify relevantly in his own behalf, especially if prepared by his attorney if this becomes a viable defense option.  He was very motivated to help himself via available legal safeguards.

. . . .

Results [of psychometric testing] suggested that he is probably rather immature and narcissist [sic] and self indulgent.  He probably is resentful of even the mildest demands made of him by others. . . .  Such individuals are especially resentful of authority and may derogate authority figures.

. . . .

All things considered Mr. McDavid appears to suffer from a Personality Disorder, Not Otherwise Specified With prominent Antisocial Narcissistic and Borderline Features. . . .  He probably meets the criteria for Pedophilia and may meet the criteria for Paraphilia, Not Otherwise Specified, involving sexual arousal from the infliction of emotional pain on others.

(Ex. T, Report of Harry A. McClaren, Ph.D. dated February 28, 2005).

The report of Dr. Leland included the following observations and conclusions:

Mr. McDavid cooperated with the current evaluation and seemed almost exhibitionistic in his eagerness to talk about his personal beliefs and predilections (which he did with much elaboration). He is obviously a very intelligent, well-read, and verbally facile individual, who conveyed a brittle self-confidence, at times bordering on smugness and superiority. He was also engaging and rather charismatic and clearly reveled in having an audience to which he could demonstrate his rather impressive abstract-thinking skills. He spoke at great length about various social, political, and philosophical matters (in addition to his own sexual fantasies and practices), liberally citing important authors and works of literature. It was impossible to constrain him to a question-and-answer interview format, as he invariably took control of the conversation and directed it to topics that were of interest to him. His speech frequently took on a fluid, stream-of-consciousness quality. However, rather than reflecting pathological disorganization, it was more suggestive of creative, unconventional thinking. No delusions (i.e., grossly irrational beliefs) were elicited. Emotional expressions were appropriate to the topic of conversation and consistent with elevated and expansive mood. There were indications of an inflated sense of self-importance and a desire to be recognized as unique and special.

Mr. McDavid appears to see himself as a lone spokesman for a radically conservative (if not fascist) doctrine of gender, ethnic, racial, and sexual (i.e., heterosexual vs. homosexual) inequality. At the risk of over-simplifying his beliefs, he argues for the obvious superiority of White, European, heterosexual, males and views himself as the only person with the intellectual honesty and strength to speak harsh truths in the current climate of political correctness. He has clearly given serious thought to these ideas and supported them with some interesting, uniquely-reasoned arguments. In the context of this discussion, he introduced the topic of his own sexual fantasies and practices, including his attraction to young girls. He asserted that there is nothing deviant or

pathological about his sexual interests and maintained that nearly all men, if they had the courage to be honest with themselves, would acknowledge similar desires. He also offered a self-serving rationalization for his pattern of sexual involvement with (and apparent exploitation of) prostitutes, claiming that through his honesty and acceptance of all aspects of his own sexuality, he is able to help sexually traumatized women to work-through their sexual inhibitions and conflicts.

. . . .

I had little success obtaining much personal background information from Mr. McDavid. He was not guarded or evasive, but rather seemed to be very much interested in showcasing his beliefs and life-style preferences.

. . . .

With respect to the question of Mr. McDavid's competency to proceed, it is my opinion that he is competent. . . . I do have some concern about his ability to focus on the practical matters of his case (in light of his great interest in discussing his personal beliefs and practices). . . . At this time, I believe that he probably has the ability to disclose to his attorney facts pertinent to the proceedings at issue, to testify relevantly, to manifest grossly appropriate courtroom behavior, and to assist his attorney in planning a defense/legal strategy consistent with the reality of his circumstances.

Mr. McDavid does not appear to suffer form a major mental illness. Rather, his presentation is consistent with Narcissistic Personality Disorder, a condition characterized by an inflated sense of self-importance, the belief that one is special, a sense of entitlement, over-reaction to criticism, need for constant attention and admiration, lack of empathy, and interpersonal exploitation. It also appears that he meets the criteria for the diagnosis of Pedophilia, Nonexclusive Type (attracted to children and adults).

(Ex. T, Report of Terence Leland, Ph.D. dated April 10, 2005).

Also included in the state court record is the portion of the trial transcript during

which the trial judge questioned Petitioner as to his decision whether to testify:

> THE COURT: I need to ask Mr. McDavid, Mr. McDavid, it's my understanding from Mr. Ruiz that you are or are not going to testify, which?

> THE DEFENDANT: Are not.

> THE COURT: You are not. Let me ask you this, sir. Despite the fact we've gotten a late start, it in no way should limit you in wanting to testify. We have plenty of time, because the case actually when faster yesterday than it was anticipated by me, at least, and so there's plenty of time for you to testify, if you wish to do that.

> But I want to advise you, to make sure you understand, that the ultimate decision to testify or not testify is your decision. You're the captain of the ship in that regard. Do you understand that?

> THE DEFENDANT: Yes, sir, I do.

> THE COURT: And your attorney, which attorneys will usually advise their client one way or the other, but whatever your attorney advises you, and I don't want to get into the attorney client privilege areas, I want you to understand that you're the one that makes the final call on that.

> THE DEFENDANT: Yes, sir.

> THE COURT: Okay. Do you need any more time to discuss this matter with Mr. Ruiz, your testimony?

> THE DEFENDANT: No, sir, I do not.

THE COURT: And do you therefore wish not to testify in this case?

THE DEFENDANT: That's correct, sir.

THE COURT: Now, sir, I'm allowing the State to reopen the testimony to introduce one limited matter into evidence, that is, your age, your date of birth or age. In any way does that change your mind about wanting to testify or not?

THE DEFENDANT: No, sir, it does not.

THE COURT: All right. Mr. Ruiz, is there anything you wish to add on the record in this regard?

MR. RUIZ: Judge, I have spoken with Mr. McDavid numerous times. We had a conversation a few moments ago when Your Honor went back to do some research. When I explained to Mr. McDavid what some of the consequences could be in terms of what the prosecution could do if he were to take the stand, I think he had a better grasp of why it would not be in his interest to testify, with the understanding, obviously, that ultimately it's his decision.

But I explained to him there's been no evidence put forth before the jury up to this point with respect to any of Mr. McDavid's positions on many political issues, and I felt like if he were to take the stand a lot of things could potentially be brought out that could hurt him both at the trial level and also perhaps at the appellate level as well. So he has decided not to take the stand based on our discussion.

THE COURT: All right. And is that correct, Mr. McDavid?

THE DEFENDANT: Yes, sir.

THE COURT:  You paused a minute, sir.  You certainly don't feel like you've got—you can't change you [sic] mind if you don't want to change your mind.

THE DEFENDANT:  No, sir. I did not want to change my mind. I just do want to state that my political views will be aired over the next period of years indeed.

THE COURT:  All right.  I understand that, sir.

THE DEFENDANT:  Yes, sir.

THE COURT:  Again, if you wish to testify on your behalf in this case, you certainly are entitled to it.

THE DEFENDANT:  No, sir.  I do not want to testify.

(Ex. S, Transcript of Jury Trial, Friday, May 19, 2006, pp. 254–57) (emphases added).

Petitioner asserts his decision not to testify was based upon the erroneous advice by Attorney Ruiz, that the State may be able to use Petitioner's post-arrest statements as a prior inconsistent statement and for impeachment.  Petitioner contends Ruiz's advice was erroneous, because Petitioner's post-arrest statements were obtained in violation of <u>Miranda</u>, thus, the State could not use any of his post-arrest statements for any purpose.[11]

---

[11] Petitioner asserts that his position on the admissibility of the post-arrest statements, *i.e.*, that they were inadmissible for any purpose, was shared by Attorney Ruiz and the prosecutor, despite Ruiz's advice to the contrary.  In support, Petitioner submitted the attorneys' responses to Petitioner's Florida Bar complaints, in which Petitioner states both of them stated that Ruiz "won a ruling suppressing the videotape for any purpose" (*see* ECF No. 15 at 17).

Although a defendant's statement that is suppressed as a result of <u>Miranda</u> violations is unavailable to the State during its case-in-chief, the statement may be admissible as a prior inconsistent statement and used by the State for impeachment purposes. *See* <u>Harris v. New York</u>, 401 U.S. 222, 91 S. Ct. 643, 28 L. Ed. 2d 1 (1971); *see also* <u>Washington v. State</u>, 432 So. 2d 44, 47 (Fla. 1983) (where defendant's confession was presented by the State in rebuttal after defendant had testified in his own defense, it was not necessary for the State to establish that the requirements of <u>Miranda</u> had been followed in obtaining the confession).

---

Petitioner mischaracterizes the attorneys' responses to the Bar complaints, which are part of the state post-conviction record (Ex. U). The relevant portion of Attorney Ruiz's response to The Florida Bar does <u>not</u> state that Petitioner's post-arrest statements were inadmissible for any purpose; instead, Ruiz states, "At trial I was successful in getting his [Petitioner's] two to three hour statement to police suppressed as violative of his right to remain silent under the <u>Miranda</u> decision" (Ex. U, Letter from Adam Ruiz, Esq. to The Florida Bar, dated August 13, 2006).

The prosecutor's response to The Florida Bar states, in relevant part:

Prior to the trial, Mr. Ruiz and I discussed the admissibility of a taped statement the defendant gave to law enforcement at the time of his arrest. The statement was approximately three hours in length. It was decided not to attempt to introduce the tape at trial prior to the proceedings beginning as there would have been too many things on the tape that would have had to be redacted. However, during the trial an issue arose and I made the decision to attempt to introduce the statement. Defendant's counsel then argued to the court that the tape was inadmissible under the laws of the State of Florida. Based on the Court's ruling, the State was unable to play any portions of the tape to the jury.

(Ex. U, Letter from Kathryn Ray, Assistant State Attorney to The Florida Bar, dated November 22, 2006).

Case No.: 4:16cv30/WS/EMT

Here, the state post-conviction court reasonably concluded that Attorney Ruiz's advice, that Petitioner not testify, was reasonable. Even if Petitioner's post-arrest statements to law enforcement were obtained in violation of <u>Miranda</u>, the statements would have been admissible, if Petitioner had testified, as prior inconsistent statements and otherwise for impeachment.

Additionally, Attorney Ruiz was concerned, and understandably so, that if Petitioner took the stand, the jury might hear matters concerning Petitioner's positions on many political issues which, based upon the views Petitioner espoused to Attorney Ruiz and the doctors who examined him, would not be beneficial to the defense. As Ruiz stated in a letter to Petitioner, which Petitioner submitted to the state post-conviction court:

> As I have previously discussed with you, the strategy is two-fold. One is to continuously challenge the sufficiency of the evidence. That is to say the state cannot just throw a photo in front of the jury and get a conviction. The state is going to need to establish the proper predicates. Of course if you take the stand and start rambling about Socratic love affairs and marrying thirteen year olds we could have a serious problem.

(Ex. U, Letter from Adam Ruiz, Esq. to Mr. Stacey McDavid, dated January 30, 2006). The basis for Attorney Ruiz's apprehension about the jury's potentially hearing Petitioner's political views is also evident from Ruiz's response to Petitioner's Bar complaint:

Communication with Mr. McDavid was and always has been a one sided conversation. Mr. McDavid holds very strong beliefs that his conduct is justifiable. Throughout the period of our firm's representation of Mr. McDavid, visits with him consisted of listening to his beliefs concerning sexuality and how adult sexual relationships with children were practiced in ancient societies. Mr. McDavid explained that these types of attractions/relationships were considered acceptable conduct in ancient societies and he was in jail merely because of "misplaced" puritan beliefs that existed in the United States. Mr. Robert A. Morris also visited Mr. McDavid at the jail and was subjected to similar proselytizing speeches.

Mr. McDavid holds very strong misogynistic views that he would constantly share with us. Apparently, he is under the impression that women are one of the chief sources of the problems in his life. Included in his belief system and among the items shared with counsel, but completely irrelevant to his case was his belief that the primary ailment of society is rooted in a woman's right to vote. Mr. McDavid would ramble on about African-Americans and how integrating the public schools in St. Petersburg was somehow tied to his problems. Mr. McDavid always made it a point to state that he did not hate blacks he just hated "niggers." When interviewed by the police, Mr. McDavid stated that he had a pending case in St. Petersburg for possessing a firearm by a convicted felon. Mr. McDavid explained that he was planning to use the gun to "kill niggers." For hours upon hours Mr. McDavid would rant about these and other issues that had absolutely no bearing on the material facts of the case.

(Ex. U, Letter from Adam Ruiz, Esq. to The Florida Bar, dated August 13, 2006).

Attorney Ruiz also considered the reports of Dr. McClaren and Dr. Leland in advising Petitioner not to testify. Those reports contained information which would cause any reasonable lawyer to advise his client not to testify, including that (1)

Petitioner was preoccupied with sexual issues and his perceived mistreatment by women and black people; (2) Petitioner stated there was a possibility he might use his current legal situation as a sort of pulpit for his ideas in regard to various perceived injustices in the world; (3) Petitioner may, if he perceived himself likely to be convicted, express his strong views in court; (4) it was "impossible" to constrain Petitioner to a question-and-answer interview format, as he invariably took control of the conversation and directed it to topics that were of interest to him; and (5) Petitioner's speech frequently took on a fluid, stream-of-consciousness quality. In light of this information, it was reasonable for Attorney Ruiz to have great reservations about his ability to control Petitioner as a witness if he took the stand.

The state court reasonably concluded the Attorney Ruiz was not ineffective with regard to his advising Petitioner not to testify. Therefore, Petitioner is not entitled to federal habeas relief on Ground Six.

V.     CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." If a certificate is issued "the court must state the specific issue or issues that satisfy the showing

required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice

of appeal must still be filed, even if the court issues a certificate of appealability. 28

U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has

made a 'substantial showing of the denial of a constitutional right.'" Miller-El, 537

U.S. at 336 (quoting § 2253(c)(2)). "At the COA stage, the only question is whether

the applicant has shown that 'jurists of reason could disagree with the district court's

resolution of his constitutional claims or that jurists could conclude the issues

presented are adequate to deserve encouragement to proceed further.'" Buck v. Davis,

580 U.S.—, 137 S. Ct. 773 (2017) (citing Miller-El, 537 U.S. at 327). The petitioner

here cannot make that showing. Therefore, the undersigned recommends that the

district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order,

the court may direct the parties to submit arguments on whether a certificate should

issue." Thus, if there is an objection to this recommendation by either party, that party

may bring this argument to the attention of the district judge in the objections

permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.     That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2.     That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this <u>18</u>th day of May 2017.


<u>/s/ *Elizabeth M. Timothy*</u>
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**




<u>**NOTICE TO THE PARTIES**</u>

        **Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**